In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1898

WAYNE KUBSCH,

*Petitioner-Appellant,*

*v.*

RON NEAL, Superintendent, Indiana State Prison,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division
No. 3:11-cv-42-PPS — **Philip P. Simon**, *Chief Judge*.

ARGUED FEBRUARY 9, 2016 — DECIDED SEPTEMBER 23, 2016

Before WOOD, *Chief Judge*, and POSNER, FLAUM,
EASTERBROOK, KANNE, ROVNER, WILLIAMS, SYKES, and
HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. On September 18, 1998, someone murdered three people in Mishawaka, Indiana: Beth Kubsch, Rick Milewski, and his son Aaron Milewski. Beth's husband, Wayne Kubsch, was accused and convicted of the triple murders and sentenced to death. After direct appeals and post-conviction proceedings in Indiana's state courts, Kubsch

turned to the federal court for habeas corpus relief under 28 U.S.C. § 2254. Although he raised a number of arguments in support of his petition, by now they have been distilled into one overarching question: did the state courts render a decision contrary to, or unreasonably applying, the U.S. Supreme Court's decision in *Chambers v. Mississippi*, 410 U.S. 284 (1973)?

The stakes could not be higher: because the state courts found *Chambers* inapplicable, the jury never heard evidence that, if believed, would have shown that Kubsch could not have committed the crimes. The district court and a panel of this court concluded that the state court decisions passed muster under the deferential standards imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). See *Kubsch v. Neal* (*Kubsch IV*), 800 F.3d 783 (7th Cir. 2015). That opinion was vacated when the full court decided to hear the case en banc. We now reverse and remand for issuance of the writ.

## I

### A

We begin by outlining what happened on the fateful day, relying on the facts that were admitted at the second trial, as recounted by the Indiana Supreme Court. See *Kubsch v. State* (*Kubsch II*), 866 N.E.2d 726 (Ind. 2007) (second trial); see also *Kubsch v. State* (*Kubsch I*), 784 N.E.2d 905 (Ind. 2003) (first trial), and *Kubsch v. State* (*Kubsch III*), 934 N.E.2d 1138 (Ind. 2010) (post-conviction). As this account shows, the state's case was based entirely on circumstantial evidence; all agree that there was no direct evidence of guilt.

Wayne and Beth Kubsch were married in November 1997. It was a second marriage for both: Beth had two sons, Aaron

Milewski, from her previous marriage to Rick Milewski, and Anthony Earley; and Kubsch had a son, Jonathan, who lived in Michigan with his mother, Tina Temple. Aaron lived with Rick in South Bend, Indiana, while Anthony lived with Kubsch and Beth in nearby Mishawaka. Kubsch owned the family home, as well as 11 rental properties in St. Joseph County. These properties were encumbered by mortgages totaling approximately $456,000 as of mid-1998. Kubsch also had credit-card debt exceeding $16,000. He tried paying that off by refinancing four of his rental properties, but by August 1998 the credit-card debt had reached $23,000, and by September Kubsch was falling behind in his mortgage and tax payments. Around that time, he bought a life insurance policy on Beth, with himself as the sole beneficiary; the policy was to pay $575,000 on her death.

On the morning of September 18, 1998, Beth's birthday, both Wayne and Beth Kubsch were up early. Testimony from Beth's coworker Archie Fobear established that by 6:00 a.m. Beth had already left the home that she shared with Kubsch on Prism Valley Drive in Mishawaka and was just starting to work at United Musical Instruments in Elkhart, Indiana, approximately 11 miles away. Cellular telephone records indicated that Kubsch made a call at that time from the sector just adjacent to the one covering the home. He was driving to his place of employment at Skyline Corporation, also in Elkhart; he punched in at 6:50 a.m. Cell records show that Kubsch made a telephone call at 9:11 a.m. somewhere near his workplace, and that he made another call at 10:45 a.m. from Skyline's break room. The latter call was to the home, presumably to Beth, who had finished her shift at 10:00 a.m., returned home, and paged him twice from home around 10:30 a.m.

At 10:48 a.m., a five-minute call was placed from the Kubsch home to the home of Rick Milewski. At that point Beth left the house to run some errands. A security camera at the Teacher's Credit Union shows Beth, along with her dog, in her car at a drive-up window at 11:08 a.m. There is a credit union receipt stamped 11:14 a.m. confirming a completed transaction. A little while later, at 11:52 a.m., Beth was with credit counselor Edith Pipke at the Consumer Credit Counseling Agency in South Bend. No evidence admitted at the second trial indicated where she was after she left the credit union and before she arrived for her appointment.

In the meantime, Kubsch drove back to the Prism Valley Drive house after punching out from his job at 11:13 a.m. Erin Honold, a neighbor, saw him and his car in the driveway between 11:30 a.m. and noon, around the time when Beth was speaking with the credit counselor. Telephone records from the house indicate that a call was made at 11:37 a.m. to American General Finance; Kevin Putz, an employee of that company, testified that he spoke to Kubsch that morning. Before leaving the house, Kubsch admitted at the second trial, he had smoked part of a marijuana joint before returning to work. Between 12:09 and 12:11 p.m., Kubsch made three more calls using his cellphone, one to the house (implying that he was no longer there) and two to Rick Milewski. He apparently interrupted Rick while Rick was speaking with his brother Dave about an upcoming hunting trip. Dave testified that Rick said that Kubsch was calling to discuss moving a refrigerator at the Prism Valley Drive house.

Beth paged Kubsch again at 12:16 p.m.; cell records indicate that at 12:18 p.m., he called the house for 31 seconds from the vicinity of Osceola, a town between Mishawaka and

Elkhart. Kubsch returned to Skyline and finished smoking his joint; he did not punch back in. He made two phone calls from the break room, one at 12:40 p.m. and the other at 1:17 p.m. Between those calls, Rick called Beth at 12:46 p.m. Kubsch punched out of work again, this time for the day, at 1:53 p.m. A minute later, he called the house from Elkhart and was on the line for 46 seconds. The next call from Kubsch's cell phone came at 2:51 p.m.; it was from a sector near the house. Kubsch testified that he was at the house between 2:30 and 2:45 p.m., but that no one else was there. The state's theory was that this was approximately when he committed the murders—between his 1:53 and 2:51 p.m. phone calls.

Witnesses testified that Aaron was waiting outside Lincoln Elementary School in South Bend and that Rick picked him up there between 2:20 and 2:35 p.m. (The school is now called Lincoln Primary Center, a member of the South Bend Community School Corporation; Lincoln's after school program begins at 2:20 p.m., presumably when the school day ends. See South Bend Community School Corporation, http://sbcsc.ss10.sharpschool.com/parents/Before%20&%20After%20School%20Care/kaleidoscope_club_-_after_school_program/ (last visited Sept. 23, 2016).) If so, that would narrow the possible window for Kubsch to have committed the crime down to only a few minutes. We return to this point later, in our discussion of the *Chambers* issue.

Around 3:15 p.m., Kubsch placed numerous calls to Beth's mother, Diane Rasor; he eventually connected on the 11th try. Cellular records indicate that by then he was driving north toward the Michigan border. Between 4:42 and 4:47 p.m. Indiana time, Kubsch made some calls picked up by the cell tower in Schoolcraft, Michigan, which is about 11 miles north

of Three Rivers, Michigan, where Kubsch's son Jonathan lived with his mother. (For the sake of consistency, we use Indiana time throughout this account; in fact, though most of Indiana and most of Michigan are in the Eastern time zone, Indiana in 1998 had not yet adopted Daylight Savings Time; thus Indiana was on Eastern Standard Time in September 1998, while most of Michigan, including Three Rivers and Schoolcraft, was an hour ahead on Eastern Daylight Time.) Around 5:00 p.m., Kubsch picked up Jonathan; he also said hello to his friend Wayne Temple around 5:30 or 5:45 p.m. at the local Kmart store. He then headed back to Osceola with Jonathan, stopping for ten minutes at the home of Constance Hardy, the mother of his friend Brad. At 5:56 p.m., he made a call from the cellular region close to the Prism Valley Drive house.

Beth's son Anthony had expected his mother to pick him up late in the afternoon after a school dance. When she did not show up, Anthony got a ride home with a friend. He arrived around 5:30 p.m., saw his mother's car and Rick's truck in the driveway, and found the house locked. Anthony used his key to enter, saw bloodstains and signs of a struggle, and discovered Rick's body at the foot of the basement stairs. He went down the stairs, saw a large knife stuck in the body, and found Aaron's body nearby. Anthony immediately ran for help, and police arrived by 5:45 p.m. Both Rick and Aaron had multiple stab wounds, but at that point the police did not notice any gunshot wounds, nor did they find Beth. Some officers left to obtain a search warrant for the house, and others remained at the crime scene.

Thus it was when Kubsch showed up at the house at 6:45 p.m., he found the house surrounded by police. The police

took Kubsch to the station, interviewed him, and then re-
leased him. The audio- and video-recording of that interview
shows Kubsch appearing to be under control, not distraught
or showing any emotion. He made no reference to his missing
wife. During the interview, Kubsch told the police that he and
Beth had planned to meet for lunch to celebrate her birthday,
but that he had called to cancel because he had been late for
work. He also said that he had gotten permission to leave
work early so that he could buy her a present. (He did not do
that until later in the day.) He told the police that he had gone
home at lunchtime but could not get in, because he had for-
gotten his key. He did not say that he had gone home a second
time, shortly after work, before heading to Michigan.

After the interview, according to testimony from Kubsch's
friend Dave Nichols and Nichols's ex-wife (Gina DiDonato),
Kubsch called them and, according to the state, said two
things that only the killer, or someone who had talked to the
killer, would have known at that point. The first was that Beth
was "gone." Nichols interpreted this as meaning dead, not
missing, although the word is obviously ambiguous. They
also testified that Kubsch said that Rick and Aaron had been
shot, a fact the police learned only the next day. (Kubsch pre-
sented testimony that DiDonato had learned both of these de-
tails several months later from a "gossiping waitress" and
then relayed them to Nichols. *Kubsch III*, 934 N.E.2d at 1153.)
Around 9:00 p.m., the police discovered Beth's body con-
cealed in the basement. She, too, had been stabbed multiple
times, and her head and body had been wrapped in duct tape.

The police immediately brought Kubsch back in for a sec-
ond interview that evening. He did not appear surprised to
learn of Beth's death. Asked several times by the officers to

tell them what happened, Kubsch chose instead to invoke his right not to speak without an attorney. The police did not arrest him for the murder immediately. They did, however, find some additional shreds of inculpatory evidence: the wrapper of a roll of duct tape of the type found on Beth in Kubsch's car; a roll of duct tape at the top of the basement stairs with a cloth fiber consistent with the carpet of Kubsch's car stuck to it; a receipt for the purchase of three rolls of duct tape; and a wadded-up receipt in Kubsch's car from Beth's credit-union deposit that morning. There was no evidence of how many brands of duct tape there are, or if the type or types found were common. Kubsch explained that he often kept duct tape in his truck for use at his rental properties. *Kubsch I*, 784 N.E.2d at 915 n.4. Finally, the knives used for the murders came from a set in the kitchen.

Despite all this, the police waited three months before arresting Kubsch. One additional clue seems to have prompted their action: a person named Tashana Penn Norman told them that she and her boyfriend overheard a person saying that he had "hurt[ ] a little boy," and she identified Kubsch as the speaker.

Kubsch was arrested on December 22, 1998, and charged with all three murders. The state's theory was that Kubsch killed Beth at the house between 1:53 and 2:51 p.m., intending to collect the insurance money, but that just as he was killing Beth, Rick and Aaron showed up, and so he murdered them, too. In that connection, in an attempt to explain the lack of any blood or other physical evidence on Kubsch's clothes or in his truck, the state hypothesized that Kubsch showered and changed his clothes at the house after committing the murders and then left for Michigan. *Kubsch III*, 934 N.E.2d at 1153.

Kubsch's theory of defense was based on actual innocence. As the Indiana Supreme Court noted in *Kubsch I*, he maintained that he "was in Michigan picking up his son at the time of the murders and that Brad Hardy, a lifelong friend of Kubsch, committed the murders." 784 N.E. 2d at 912. This was not a fanciful theory: Hardy was charged with assisting a criminal and conspiracy to commit the three murders at issue here. *Id.* at 912 n.1; *Kubsch II*, 866 N.E.2d at 731. The state dropped the charges against Hardy after he testified under a grant of immunity in Kubsch's first trial. *Kubsch II*, 866 N.E.2d at 731. Hardy's lawyer was St. Joseph County Prosecutor Michael Dvorak, who was then in private practice, and who prosecuted Kubsch's second trial. The Indiana Supreme Court rejected Kubsch's argument that Dvorak had a conflict of interest. The district court found this to be a reasonable outcome, and Kubsch has not pursued the point in this court.

The federal district court judge who presided over Kubsch's habeas corpus proceeding described the case against Kubsch as "entirely circumstantial. There was no eyewitness, no DNA evidence, no fingerprint testimony, indeed no forensic evidence at all that linked Kubsch to the murders." Instead, there was what he called a "slow-moving accumulation of a glacier of circumstantial evidence," principally "lies, inexplicable omissions, and inconsistencies" in Kubsch's own account of the event.

We have no doubt that a reasonable jury could have viewed these facts as sufficient to convict Kubsch for the murders. The fact that the evidence was purely circumstantial is of no moment: juries properly rely on circumstantial evidence every day. But the jury never heard a critical additional piece of evidence, which, if credited, would have permitted them to

find that the police had the wrong man. Because of its importance, we now describe the omitted evidence in detail.

B

The critical evidence that was kept from the jury was videotaped testimony by a girl named Amanda ("Mandy") Buck, "who, according to the defense, would have testified that she saw Aaron after 3:30 p.m. on the day of the murders." *Id*. at 730. Mandy, who was nine years old at the time, was interviewed immediately after the murders, on Tuesday, September 22, 1998. The interviewer was Detective Mark Reihl; the interview took place in what appears to be a room in the police station. Mandy's mother, Monica, was present throughout and volunteered corroborating details from time to time. We attach the full transcript of the interview as Appendix A to this opinion.

After establishing some basic information, Detective Reihl confirmed that Mandy was a fourth-grader at Lincoln School, that she lived right across the street from Aaron and his dad Rick, and that she and Aaron were "best friends." She commented that Aaron didn't like Kubsch, because he would get rough and punch too hard "and stuff like that." She saw Aaron frequently: "I always went over to his house. He always came over to my house and like we like used to study for the same spelling words. … And we would help each other on homework and stuff." When Reihl asked her when they got out of school, she replied "two twenty." She lived close to the school, she said, just a five-minute walk away.

Detective Reihl then asked Mandy directly "Now, do you remember *last Friday*," meaning September 18, the day of the murders. Mandy replied "yeah." Reihl then asked her "did

they [meaning the Alphabet Academy, her daycare facility] pick you up *Friday*?" Again, Mandy responded in the affirmative, by nodding her head. Reihl then asked her to recount what happened next. From there, Mandy said, her mother (as she usually did) picked Mandy up to take her home, "[b]etween three thirty and quarter to four." Monica interjected that on the day in question she "waited for [Monica's] mom and dad to get home, and I went and cashed my check and came home." Reihl then asked whether Monica noticed if Rick was across the street. Monica replied "I didn't pay no attention. All I saw was Aaron." Reihl repeated "You saw Aaron?," and Monica said "[m]mm hmm." She did not remember if Rick's truck was there.

Turning back to Mandy, Reihl asked again what time she got home that day. Monica answered instead, repeating "three thirty or quarter to four." Mandy confirmed that she saw Aaron then, and that she also saw "his dad," who "was coming from their living room into the kitchen to get something to drink." She explained that she was able to see this from her own house: "every day when I walk home I always see Rick walk into the kitchen or walk into the restroom or walk into his room." Asked what kind of car Rick drove, Mandy replied "[a] Chevy? He used to drive a Chevy until it broke down." She specified that it was a black, medium-sized, "kinda short" truck. When Reihl asked "what was [Rick] driving *Friday*," Mandy replied that because his truck had broken down, he was driving a white truck that he had borrowed from his brother, and that the white truck was at the house when she got home from school that day.

Reihl next asked whether she saw Rick and Aaron leave that afternoon. She answered, "Um, yeah, like I was on my

porch and, and they let me blow bubbles and I was blowin' my bubbles, and I seen Rick pull out and leave." She was not sure what time they left, because she left her watch in her bag after gym class, but she estimated it was a "medium" time after she got home. She then commented, without prompting, that "it takes a pretty long time to get to [Aaron's] mom's house."

She then went into some detail about Aaron's plans for the weekend. "He said that he was going to his mom's house Friday, 'cause he was gonna stay the night there to go to the field trip Saturday. … You know he was, he—he wanted to go on the field trip bad. … But by the time Saturday when we, when we were on the bus and stuff, he was gonna be in our group, and, um, he never showed up. He wasn't there. And we didn't know why." She went camping after the field trip and told her grandmother after she returned that she had not seen Aaron on the trip. On Sunday, she mentioned, her grandpa "didn't turn the [the TV] on … because he, he didn't know it was they got murdered Friday night." Mandy learned about the murders after a news crew came to her home while she was at her karate lesson on Monday, the day before the interview.

At that point, Reihl once again confirmed that he was asking Mandy about Friday: "So, Friday, after you got home, they left just a little bit after when you got home, right?" Mandy again said "yeah," and confirmed that she saw the two of them leave the house. No one was with them, she said, and she explained that Rick "didn't know if Aaron's mom was home yet so Rick was thinking if his mom's not there, then Wayne's probably not there. So, he said, 'I'll just drive you,' and they just took off, pulled out and took off."

Reihl then turned back to Monica and confirmed that she cashed her paycheck on Friday, shortly after she came home from work (around 3:50 p.m.). She said again that she had seen Aaron, but not Rick, when she returned about 15 minutes later, and (in response to Reihl's question) she said that she did not look to see if Rick's truck was there. They discussed what kind of truck Rick typically drove. By then, the interview was winding down. Reihl asked Mandy yet again whether she saw both Aaron and his father in the yard around 3:30 or 3:45 p.m., and she said yes. He asked whether "[t]hese times that you've given me today, uh, these are pretty accurate," and Monica said, "Yeah, 'cause I get off work at quarter after three." This was her daily routine. With that, the interview ended.

A few days after Mandy's interview, Reihl called Monica's place of employment and then her home, apparently in an attempt to confirm yet again that both Mandy and Monica had correctly recounted what happened and when it happened. Reihl spoke to Mandy's grandfather ("Lonnie") and asked him to find out if Mandy and Monica were certain about their story. Lonnie called Reihl back and told him that the events that Mandy and Monica had described had taken place on Thursday, September 17, not on Friday, which had been the exclusive focus of Reihl's interview.

The prosecutors recounted at Kubsch's trial that Monica told the police that "her father was at her house on that Thursday, and he later reminded her that it was Thursday instead of Friday." She said that she—Monica—had confused the dates because she was so busy; she offered no reason why Mandy would have confused them. Nor was there any effort to explain away Mandy's detailed comments about the timing

of the Saturday field trip and her subsequent camping trip, karate lesson, and so on. At that early time, not a week after the field trip, it would have been easy to confirm with the school whether the trip took place on Saturday, September 19, or Friday, September 18. (And even the trial evidence shows Rick picking up Aaron at school between 2:20 and 2:35 p.m. on Friday, strongly suggesting that there was no field trip that day, and also undermining the state's theory that the murders were committed between 1:53 and 2:51 p.m., particularly if the state's theory that Kubsch had time to shower and change clothes before leaving by 2:51 p.m. is credited.) In addition, it would have been relatively easy to confirm when Monica was paid and made her deposit, just as evidence had shown when Beth visited her own bank.

Mandy was called to testify at the second trial, but she had almost nothing to say. She claimed to have no memory of talking to the police or being interviewed by them in 1998. When Kubsch's lawyer attempted to use the transcript of the interview to refresh her recollection and later to impeach her, the prosecution objected and the court sustained the objections. The court also refused to permit the use of the videotaped interview as a recorded recollection, despite Mandy's asserted inability to recall anything about the interview.

## II

The Indiana Supreme Court set aside Kubsch's conviction after his first trial; it affirmed the conviction and sentence reached at the second trial, which took place in March 2005, and so that is what is now before us. Kubsch had one and only one defense to the three murder charges: actual innocence. For the most part, his lawyers pursued this in the only way they could, by attempting to impeach the state's witnesses.

They also tried to call Mandy as a witness, either to testify about her independent recollection of the events of September 18, 1998, or to provide a basis for the introduction of the videotape of her interview with Detective Reihl as a recorded recollection admissible under Indiana Rule of Evidence 803(5). But they hit a brick wall. Mandy, by then 16 years old, testified that she had no recollection either of seeing Rick and Aaron on the afternoon of the murders, or even of being interviewed by the police the following Tuesday. The trial court permitted her to review the video recording of her interview, but she maintained that this did not refresh her recollection. Kubsch's lawyers never tried to use Monica to provide foundation for the recording, nor did they call her as a witness.

Indiana Rule of Evidence 803, like its federal counterpart, sets out exceptions to the ordinary rule under which hearsay evidence is not admissible. The exception that Kubsch's lawyers wanted to use was for recorded recollections. Rule 803(5) provided at the time for the admissibility (for the truth) of:

> [a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly … .

In *Kubsch II*, the Indiana Supreme Court held that the final element—that the recording reflects the witness's knowledge correctly—was the only one at issue, and that Kubsch had failed to meet it. It interpreted the rule to require the witness to be able to "vouch for the accuracy of the prior statement," citing *Gee v. State*, 389 N.E.2d 303, 309 (Ind. 1979). 866 N.E.2d

at 734. Mandy could not do so, given her asserted inability to recall the interview at all. *Id.* at 735.

Kubsch's lawyers also wanted to use the video to impeach one statement that Mandy made at trial, namely, that "I probably didn't see [Aaron], because I go straight [from] home to the day care, and then I would go home afterwards." *Id.* That testimony directly contradicted her statements to the police in the videotaped interview, and the Indiana Supreme Court held that Kubsch should have been allowed to impeach her on that matter. It found the error to be harmless, however, because it thought that other evidence would have supported her version at trial (*i.e.* Lonnie's testimony that she had the days mixed up).

We have no reason to disagree with the state court on the harmless nature of this failure to admit impeachment evidence. Nor do we take issue with the holding that, as a matter of Indiana law, Mandy's inability to vouch for the accuracy of her prior statement meant that it could not be admitted for the truth under Indiana Rule of Evidence 803(5). But the last word does not belong to state law; it belongs to the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. The central question before us is thus whether, in these circumstances, the state court rendered a decision contrary to, or unreasonably applying, the Supreme Court's decision in *Chambers*.

### III

The clash between ordinary evidence rules and constitutional due process that the Supreme Court addressed in *Chambers* is functionally identical to the one now before us. Like our case, the issue arose in a murder prosecution. Like

our case, it involved the state's hearsay rule as well as a second rule—in *Chambers* the state's voucher rule for witnesses, in our case the state's rule requiring vouching before recorded recollections may be introduced. And like our case, the evidence that was excluded pursuant to the state evidentiary rule was vital to the defense, and the circumstances provided ample assurance that the evidence was reliable. A closer look at *Chambers* demonstrates these similarities.

On Saturday evening, June 14, 1969, in Woodville, Mississippi, two policemen—James Forman and Aaron Liberty—entered a local bar to execute a warrant for the arrest of a young man named C. C. Jackson. The arrest did not go well; a hostile crowd of 50 or 60 people tried to impede their work. Liberty removed his riot gun while Forman radioed for assistance. Three deputy sheriffs arrived, but Forman and Liberty were once again stymied in their efforts to arrest Jackson. During the commotion, five or six shots were fired. Forman saw that Liberty had been shot several times in the back. He died of his wounds, but before that, he managed to fire both barrels of his riot gun into an alley. The second shot hit Leon Chambers. Chambers fell and for a while was presumed dead.

The general chaos made it hard to see who was shooting whom. Forman could not tell, from his vantage point. One of the deputies testified that he saw Chambers shoot Liberty; another said that he saw Chambers "break his arm down" just before the shots were fired. Shortly after the shootings, three of Chambers's friends realized that he was still alive and got him to the hospital. Chambers was later charged with Liberty's murder. He pleaded not guilty and steadfastly maintained his innocence.

One of the people who helped Chambers get to the hospital was Gable McDonald. He left Woodville shortly after the bar incident and moved to Louisiana. He later returned to Woodville, however, where he confessed under oath to Chambers's attorneys that he was the one who shot Liberty. He had also told a friend, James Williams, that he shot Liberty. He was arrested based on these statements, but at a preliminary hearing a month later, he repudiated his confession.

At the trial, Chambers pursued two lines of defense. First, he tried to show that he was not the person who shot Liberty. Second, and pertinent here, he tried to show that McDonald was the guilty party. He was thwarted, however, in his efforts to put before the jury all the evidence supporting that defense. One witness testified that he saw McDonald shoot Liberty, and another witness testified that he saw McDonald with a gun immediately after the shooting. But Chambers wanted to introduce much more powerful evidence: McDonald's own confessions. McDonald had admitted responsibility on four separate occasions: in his sworn statement to Chambers's counsel, and three other times in private conversations with friends. As the Supreme Court put it, Chambers failed because of "the strict application of certain Mississippi rules of evidence." 410 U.S. at 289. The first was Mississippi's party-witness or voucher rule, under which a party is not permitted to impeach his own witness; the second was Mississippi's hearsay rule. *Id.* at 294. The Supreme Court found that these rules, in combination, deprived Chambers of his federal due-process right to present a defense.

The Court's discussion of the hearsay rule guides us here. The rule is based on "the notion that untrustworthy evidence should not be presented to the triers of fact." *Id.* at 298. Out-

of-court statements typically lack "conventional indicia of re-liability," such as the witness's being under oath, being available for cross-examination, and being present so that the jury is able to assess demeanor and credibility. *Id.* (Some cases have questioned whether demeanor evidence is such a good sign of truthfulness. See *United States v. Pickering,* 794 F.3d 802, 804–05 (7th Cir. 2015); *Consolidation Servs., Inc. v. KeyBank Nat. Ass'n*, 185 F.3d 817, 821 (7th Cir. 1999). We leave that debate for another day.) Exceptions to the hearsay rule exist where reliability concerns are not present.

Significantly, the *Chambers* Court did not rest its holding on any criticism of Mississippi's rules of evidence, either the voucher rule or the hearsay rule. Instead, it looked at the evidence Chambers was proffering and found that "[t]he hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Chambers*, 410 U.S. at 300. It highlighted the following facts: McDonald's confessions had been made spontaneously to close acquaintances shortly after the murder; each statement was corroborated by other evidence; the sheer number of independent confessions had some weight; they were self-incriminatory; and McDonald was present in the courtroom and under oath. *Id.* at 300–01.

The Court concluded with the following passage:

Few rights are more fundamental than that of an accused to present witnesses in his own defense. … In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.

Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process.

*Id.* at 302.

*Chambers* was not a one-and-done opinion from the Supreme Court. To the contrary, the rule requiring state evidentiary rules to yield to the defendant's fundamental due-process right to present a defense has arisen in many later cases. Sometimes the Court has granted relief on that basis, and sometimes it has found no due-process violation. Westlaw shows that *Chambers* has been cited in 33 Supreme Court decisions since it was handed down. We highlight only a few of them to show how the rule as established in *Chambers* has been applied over the years.

Six years after *Chambers* was decided, the Court decided *Green v. Georgia*, 442 U.S. 95 (1979), by a per curiam opinion. Like *Chambers*, *Green* was a murder case; like our case, it was one in which the petitioner was under a sentence of death. At the sentencing stage, the state court refused on hearsay grounds to admit the testimony of Pasby, a witness who had testified at Green's co-defendant's trial that the co-defendant had killed the victim. The state then argued to the jury that in the absence of direct evidence of the crime, it could infer that Green participated directly in the murder from the fact that more than one bullet entered the victim's body. This application of the state's hearsay rule, the Court ruled, violated Green's due process rights:

> The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial … . [S]ubstantial reasons existed to assume its reliability. … The statement was against interest … . Perhaps most important, the State considered the testimony sufficiently reliable to use it against [the co-defendant], and to base a sentence of death upon it.

*Id*. at 97. With that, the Court vacated the sentence and remanded for further proceedings.

*Crane v. Kentucky*, 476 U.S. 683 (1986), was another murder case in which the Court found that the exclusion of evidence pursuant to a state evidentiary rule violated the defendant's due process rights. This time it was not the hearsay rule; it was a Kentucky rule under which, once a confession has been found to be voluntary, the evidence supporting that finding may not be introduced for any other purpose—in particular, credibility. After acknowledging its traditional reluctance to impose constitutional constraints on ordinary evidence rules,

and its recognition of the power of the states to exclude evidence "through the application of evidentiary rules that themselves serve the interests of fairness and reliability," the Court reaffirmed the due-process limitations on those principles and held that "the blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial." *Id.* at 689–90. It went on as follows:

> Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi, supra,* or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, … the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." … We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard. …That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence.

*Id.* at 690 (citations omitted). The Court came to the same conclusion the next year, in *Rock v. Arkansas*, 483 U.S. 44 (1987), in which it held, in a manslaughter case, that Arkansas's per se rule excluding all hypnotically refreshed testimony infringed impermissibly on the defendant's right to testify on her own behalf. *Id.* at 55–56, 61.

The last case we mention in which the *Chambers* rule was applied to overturn the exclusion of critical evidence is *Holmes v. South Carolina*, 547 U.S. 319 (2006), yet another murder prosecution in which a sentence of death was imposed.

This time the Court considered a state evidence rule, whose source was the decision in *State v. Gregory*, 16 S.E.2d 532 (S.C. 1941), under which a defendant may not introduce proof of third-party guilt if the prosecution had introduced "strong evidence" of the defendant's guilt, including forensic evidence. *Holmes*, 547 U.S. at 323–24. The state's theory was that in these circumstances the evidence suggesting a third party's guilt was not enough to raise a reasonable inference of the defendant's innocence. *Id*. at 324. The Court recognized, as it had before, that "[s]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Id*. (citation omitted). Nevertheless, it wrote, "[t]his latitude … has limits." *Id.* It continued:

> Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. … This right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve.

*Id.* (citations and quotation marks omitted). After reviewing some of the cases, including *Chambers, Rock,* and *Crane*, in which due process was violated by the exclusion of evidence in the name of a state rule, the Court contrasted cases where the state rule did not have the forbidden effect: "[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other fac-

tors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 326. The South Carolina rule before it, the Court concluded, was arbitrary and could not be used to exclude the petitioner's evidence. *Id*. at 331.

The cases in which *Chambers* has not required a state evidence rule to be overridden fit the general pattern described in *Holmes*. Thus, in *Montana v. Egelhoff*, 518 U.S. 37 (1996), the Court considered a Montana rule limiting the use of voluntary intoxication evidence. The respondent, charged with homicide, wanted to introduce evidence of his extreme intoxication. He did introduce it, but the jury was instructed that it could not consider his condition in determining whether he had the mental state required by the statute. Justice Scalia, writing for a plurality, rejected the proposition that *no* relevant evidence may *ever* be kept out of a trial. He found the state's rule to be consistent with the common law, and then added some remarks about *Chambers*, which he labeled "highly case-specific error correction." *Id.* at 52. (plurality opinion). Justice Ginsburg concurred in the judgment on the ground that the state had redefined the mental-state element of the offense. *Id.* at 57. (Ginsburg, J., concurring) Had it adopted a rule to keep out relevant, exculpatory evidence, she would have found that it offended due process. *Id.* Justices O'Connor, Stevens, Souter, and Breyer would have found a due-process violation. *Id*. at 61 (O'Connor, J. dissenting).

In *Clark v. Arizona*, 548 U.S. 735 (2006), the question concerned an Arizona rule that was more substantive than procedural. Arizona had a rule restricting consideration of defense evidence of mental illness and incapacity to its bearing on a claim of insanity; it thus eliminated the significance of this evidence for *mens rea*. As it had done in *Egelhoff*, the Court

(this time through a majority) held that the state rule did not violate due process. *Chambers* was peripheral to its reasoning. It quoted from *Holmes*, noting that while the Constitution prohibits the exclusion of evidence under rules that serve no legitimate purpose or are disproportionate to legitimate ends, it does permit the exclusion of evidence if its probative value is outweighed by factors such as prejudice, confusion, or potential to mislead. *Id.* at 770. In so doing, the Court noted that evidence of mental disease and capacity "is not being excluded entirely"; rather, the rule restricted the use of evidence for a limited reason which satisfied "the standard of fundamental fairness that due process required." *Id*. at 770–71.

Lastly, the Court found *Chambers* to be inapplicable in *Nevada v. Jackson*, 133 S. Ct. 1990 (2013) (per curiam), in which the question was whether a state statute that generally precludes the admission of extrinsic evidence of specific instances of a witness's conduct for purposes of attacking credibility could be applied. The Court found no constitutional problem, either under the Due Process Clause or the Confrontation Clause, with the application of the state's rule. *Id*. at 1992–94. Notably, the defendant's crime in *Jackson* was sexual assault, not murder.

We glean a number of lessons from the *Chambers* line of cases. First, as Chief Justice Rehnquist pointed out in *Gilmore v. Taylor*, 508 U.S. 333 (1993), the cases in which the *Chambers* principle has prevailed "dealt with the *exclusion* of evidence … or the testimony of defense witnesses, … [not] a defendant's ability to present an affirmative defense." *Id.* at 343 (emphasis added). Second, we think it no accident that the cases in which the Court has applied *Chambers*—*Green, Crane, Rock,*

and *Holmes*—have involved murder and often the death pen-
alty. Third, the proffered evidence must be essential to the de-
fendant's ability to present a defense; it cannot be cumulative,
impeaching, unfairly prejudicial, or potentially misleading.
Fourth, as the Court put it in *Chambers* itself, the evidence
must be reliable and trustworthy. One, though not the only,
way that reliability and trustworthiness can be demonstrated
is to show that the evidence closely resembles evidence that
would be admissible under the state's rules. Finally, the rule
cannot operate in an arbitrary manner in the case at hand. Ar-
bitrariness might be shown by a lack of parity between the
prosecution and defense; the state cannot regard evidence as
reliable enough for the prosecution, but not for the defense.
But that does not exhaust the ways of satisfying this criterion.
A refusal to consider corroborating circumstances, an unex-
plained departure from an established line of decisions, or an
assumption about the relative weight of evidence (as in *Crane*)
might also suffice.

## IV
### A

Although the Indiana Supreme Court did not have much
to say about Kubsch's *Chambers* argument in its opinion on
direct review from his conviction at the second trial, it did
reach the merits of his claim. After finding that the videotaped
evidence was inadmissible under Indiana Rule of Evidence
803(5) because Mandy had not vouched for its accuracy, and
finding that the error in excluding it for impeachment pur-
poses was harmless, the Court dropped this footnote:

> The availability of this testimony [*i.e.* that of Reihl
> and Monica to the effect that they had mixed up Thurs-
> day and Friday] is also the reason why Kubsch's claim

that he was denied his federal constitutional right to present a defense fails. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (protecting defendant's due process right by recognizing an exception to application of evidence rules where evidence found to be trustworthy).

*Kubsch II*, 866 N.E.2d at 735 n.7. That is enough to trigger the familiar AEDPA deference to the state court's conclusion. Kubsch's application for a writ of habeas corpus must be denied unless, as applicable here, the adjudication in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States … ." 28 U.S.C. § 2254(d)(1).

The Supreme Court has elaborated on what this means. There are two ways in which the "contrary to" part might be violated: a state-court decision might arrive at a conclusion opposite to that which the Supreme Court reached on a question of law; or the state court might "confront[] a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrive[] at a result different from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 406 (2000). Under the "unreasonable application" clause, the writ may not issue simply because the federal court concludes that the state court erred. *Woodford v. Visciotti*, 537 U.S. 19, 24–25 (2003). Rather, the applicant must demonstrate that the state court applied the Supreme Court's precedent in an objectively unreasonable manner. *Id.* at 25. "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). For good measure, the Court added "[i]f this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

On the other hand, the Court has never insisted on virtual identity between its precedent and the new case. In *Williams v. Taylor*, for instance, it said that "a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a *new* context where it should not apply or unreasonably refuses to extend that principle to a *new* context where it should apply." 529 U.S. at 407 (emphasis added). *Panetti v. Quarterman*, 551 U.S. 930 (2007), made much the same point. The Court there held:

> AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. … Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. … The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner.

*Id.* at 953 (citations and quotation marks omitted).

### B

Our only remaining task is to apply the relevant law and standards of review to Kubsch's case. First, this case deals with the total exclusion of relevant evidence, not with a limitation on the way the evidence can be used. Second, this was

a murder case—indeed, one in which the death penalty was being sought—and so the defendant's interest in the evidence was at its zenith. Third, the excluded evidence was easily the strongest evidence on Kubsch's only theory of defense—actual innocence. It was not cumulative, unfairly prejudicial, potentially misleading, or merely impeaching. Finally, as *Chambers* requires and as we now discuss in more detail, it was unusually reliable.

Professors Wright and Graham identify four dangers that have traditionally been thought to arise from hearsay evidence: (1) defects in the declarant's perception; (2) defects in the declarant's memory; (3) defective narration, on the part of either the declarant or the witness; and (4) lack of sincerity or veracity on the declarant's part. 30 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 6324 (1997). None of these is present to any significant degree in Mandy's video. As the transcript at Appendix A illustrates, Detective Reihl questioned her carefully and thoroughly, checking several times that she and her mother, Monica, had the right times and making it clear that his questions pertained to Friday. See Appendix A, *infra* at 43 ("Okay. And this is about what time again?"); at 51 ("Well, just so I got this right then, Mandy, you got home at about three thirty, quarter of four and you saw Aaron and his dad and that white truck at his house?"); at 52 (to Monica) ("These times that you've given me today, uh, these are pretty accurate?"). There is no reason to think that Mandy and her mother would not have been able to perceive events occurring in the house just across the street from theirs, where Mandy's friend "best friend" Aaron lived.

The interview took place just four days after the murders, on Tuesday, September 22, 1998, at 3:00 p.m. The chance of identical defects in Mandy's and Monica's memories is close to zero over that short time, and there is no reason to think that they had coordinated their stories. It is also worth pointing out that their accounts throughout the interview corroborate one another on many critical details: the fact that Monica picked Mandy up from the Alphabet Academy at the usual time (between 3:30 and 3:45 p.m.); the fact that both of them saw Aaron after they got home (and Mandy saw Rick, too); and the fact that all this happened after Monica left work at 3:15 p.m.

No defect in narration—that is, the ability of the witness to communicate her recollections of some past perception to the trier of fact—exists, because the video ensured that the trier of fact would have heard exactly what Mandy and Monica said. If there were defects in their original account, the state would have had every opportunity to introduce evidence to punch holes in their account. (Kubsch, of course, had no reason to do this; he takes the position that their account is accurate.) The state could, for instance, have subpoenaed Monica's bank to see when she made the deposit to which she referred. If she did so on Friday, September 18, the accuracy of the dating would have been corroborated. If, as the state has speculated throughout these proceedings, she did so on Thursday, September 17, that would have been powerful impeachment evidence for the state. The state could also have secured evidence from Lincoln School that would have pinned down the date of the field trip Mandy highlighted during the interview. Mandy said that Aaron had told her that "he was going to his mom's house Friday, 'cause he was gonna stay the night there to go to the field trip Saturday."

But, she continued, "by the time Saturday when we … were on the bus and stuff, he was gonna be in our group, and … he never showed up." There is no hint in this that Aaron was also going to go to his mother's on Thursday.

Finally, no one has ever said that Mandy and Monica lacked sincerity or veracity. The most the state, using Lonnie's evidence from the next week, ever said was that they were mistaken. Had the evidence come in, the state would have had a number of ways to demonstrate mistake, using the objective evidence we have just described.

The question in the end is not whether the Mandy videotape was 100% reliable. If 100% reliability were the standard, eyewitness testimony would never be used, Evidence Rule 803 would have to be repealed in its entirety, and prosecutors could never prove their case beyond a reasonable doubt. Nor is the question whether it was enough to require acquittal as a matter of law. As we said earlier, even with this evidence in the record, a rational jury could either acquit, if it found Mandy's and Monica's accounts persuasive, or it could convict, based on the circumstantial evidence chronicled in the state court's opinion. All we are saying is that the jury should have been given the chance to evaluate this case based on *all* the evidence, rather than on the basis of a truncated record that omitted the strongest evidence the defense had.

In this regard, the fact that the video missed qualifying for admission under Indiana Evidence Rule 803(5) by just a hair is also important. All that was missing was Mandy's recollection of the interview. No one argued that she was not the girl depicted on the video; no one argued that there had been tampering of the video. It is troublesome that the Indiana Su-

preme Court appeared to demand more in the way of vouch-
ing here than it has required in other cases. In *Small v. State*,
736 N.E.2d 742 (Ind. 2000), it upheld the trial court's decision
to allow the prosecution to read relevant portions of a wit-
ness's deposition even though, at trial, the witness could not
remember the answers she had given during the deposition,
and after reviewing the transcript *still* could not recall her
statements. *Id.* at 745. See also *Impson v. State*, 721 N.E.2d 1275,
1282–83 (Ind. Ct. App. 2000) (affidavit admitted where signed
shortly after attack, consistent with what affiant told another
person, even though affiant denied any memory of the attack
at trial); *Flynn v. State*, 702 N.E. 2d 741, 744 (Ind. Ct. App. 1998)
(recorded, out-of-court statement admitted under Rule 803(5)
because state showed at trial that declarant lacked recollec-
tion, that she had personal knowledge of the events in the
statement, and that she had made a full and complete state-
ment of the events according to an officer who took her state-
ment). Even if the record of Kubsch's trial does not show a
lack of "parity" in the application of Rule 803(5) within
Kubsch's own trial, these cases suggest a troubling lack of
consistency in the application of the rule.

One might criticize the video for lack of corroboration, but
that overlooks the fact that Monica's statements corroborate
Mandy's statements. If the state had wanted to undermine
their accounts, evidence was readily available to it (and we
can assume that it would promptly have turned to that evi-
dence, had the court allowed the video to be introduced). De-
tective Reihl was courteous to both Mandy and Monica, but
he circled back a number of times to ensure that their accounts
were consistent. Neither Mandy nor Monica was under oath,
but they gave their account in an official setting, at the police
department, knowing that it was being recorded. While this

might not be quite the assurance of truthfulness that a formal oath might provide, it was a close substitute. Both Mandy and Monica knew that they were being questioned in connection with a triple murder and that their statements were testimonial. We accept that Mandy was not available to be cross-examined, because she claimed to have no recollection either of the event or of the interview with Detective Reihl. But hearsay evidence typically involves a situation in which the out-of-court declarant cannot be cross-examined. Nevertheless, the Supreme Court in *Chambers* and the cases following it has said that when hearsay is otherwise reliable, is critical to the theory of the defense, and the case involves a murder prosecution, due process requires its admission.

## V

*Chambers* was decided 46 years ago; only ten years ago, in *Holmes*, the Supreme Court reconfirmed its rule: "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. … This right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes,* 547 U.S. at 324 (citations and quotation marks omitted). In other words, due process demands that evidence rules must be overridden in a narrow set of circumstances. The facts of Kubsch's case parallel so closely the facts of *Chambers*, *Green*, *Crane*, and *Holmes*, that a failure to apply those cases here would amount to an unreasonable application of law clearly established by the Supreme Court.

Nothing that the Supreme Court has said, and nothing we say, means that the hearsay rule will *never* bar the admission of video evidence. In the years since *Chambers*, neither the

hearsay rule nor the other evidentiary rules the Court has considered have wound up in the wastebasket. Only if all of the factors the Court has specified, and we have described, come together must the evidence rule yield. Due process requires no less.

We thus conclude that the Indiana Supreme Court's conclusion that *Chambers* did not require the admission of this critical evidence was either contrary to, or an unreasonable application of, the *Chambers* line of Supreme Court precedent. We therefore REVERSE the judgment of the district court and REMAND for issuance of the writ of habeas corpus, unless the state within 120 days takes steps to give Kubsch a new trial.

APPENDIX A

Transcript of Police Interview with Monica and Mandy Buck
September 22, 1998

Det. Mark Reihl:  [Inaudible] stepped out for a minute.  I'll go ahead and start asking you a couple questions.  Okay, and the time is now three o'clock PM.  And, today is September the twenty-second, nineteen ninety-nine—nineteen ninety-eight.  And Mandy, is it M-a-n-d-y?

Mandy:  Uh huh.

Reihl:  M-a-n-d-y.  Buck.  B-u-c-k?

Mandy:  Uh huh.

Reihl:  And you're how old?

Mandy:  Nine.

Reihl:  Your birthdate is?

Mandy:  Ninety-eight.  Nineteen ninety-eight. Oh, nineteen eighty-nine.

Reihl:  This is nineteen ninety-eight.

Mandy:  Nineteen eighty-nine.

Reihl:  What month were you born?

Mandy:  February.

Reihl:  February.  What day?

Mandy:  Eighth.

Reihl:  Nineteen eighty-nine.

Mandy:  Yeah.

Reihl: Alright.

Mandy: But you can ask my mommy on that. I think so.

Reihl: Oh, I'm pretty sure, all right? You're pretty intelligent. I think you know.

Mandy: Yeah, I think that, yeah yeah yeah.

Reihl: Mandy was born February the eighth?

Monica: Yeah.

Reihl: Nineteen eighty-nine?

Monica: Mmm hmm.

Reihl: Okay.

Mandy: Cool, I got it right.

Reihl: See, you got it right. Okay. And your mother's name is Monica?

Mandy: Uh huh.

Reihl: M-o-n-i-c-a? Correct me?

Monica: Yeah.

Reihl: Buck. And you live at thirteen twenty East Indiana in South Bend.

Mandy: Uh huh.

Reihl: And your home phone is two three three, seven seven three seven?

Mandy: Two three three seven seven three seven. Yep.

Reihl: Right. And you go to Lincoln School?

Mandy: Yeah.

Reihl: And you're in which grade? Fourth?

Mandy: Yeah.

Reihl: Okay. How's school this year?

Mandy: Umm, good, even though I have the teacher that, um, is the Wicked Witch of the West, she's fine. She's okay.

Reihl: Well sometimes they gotta be like that so you kids will listen.

Mandy: Yeah.

Reihl: Okay. Well, the reason you're here is that you live right across the street—

Mandy: From Aaron?

Reihl: From Aaron and his dad Rick.

Mandy: Yeah.

Reihl: Okay. And you and Aaron were pretty good friends, huh?

Mandy: Best friends, yeah.

Reihl: Best friends?

Mandy: [Nods head]

Reihl: How long have you known Aaron?

Mandy: I don't know. I think he moved there in like the beginning of May I think. Just beginning. I don't know. I never kept track of it. I don't know. 'Cause he told me one day and then I just forgot.

Reihl: Oh, that's okay.

Mandy: I can't remember I think—

Reihl: Time just goes by so fast, doesn't it? And you said that Aaron used to talk sometimes about things that made him sad?

Mandy: Mmm hmm. [Nods head]

Reihl: Made him upset?

Mandy: Right, and like he, he he wished his mom didn't break up with his dad and like go with Wayne. He was like, he didn't like Wayne.

Reihl: Aaron didn't like Wayne?

Mandy: No.

Reihl: Well how come?

Mandy: Um because, like, he would get rough with him and stuff and punch him too hard and stuff like that.

Reihl: Was it because—did he ever say was it because Wayne was mad at him or were they just playing?

Mandy: He never said, he never said why he didn't like him he just said like, he just said he just didn't like him because Wayne was just like too rough and stuff.

Reihl: Okay. Did he ever say if Wayne ever was rough with his mom?

Mandy: No.

Reihl: You didn't talk about that?

Mandy: No.

Reihl: Okay. What else did you guys talk about?

Mandy: Um, we talked about like, why he moved here and like what we wanted to be when we got older and, um, who

are our friends and where we used to live and, like, and I introduced him to my parents; he introduced me to his dad. Then we just became best friends.

Reihl: That's great.

Mandy: I always went over to his house. He always came over to my house and like we like used to study for the same spelling words. He'd give me my spelling words and I would give him his spelling words. And we would help each other on homework and stuff. We were pretty good friends.

Reihl: That's, that's wonderful.

Mandy: We got along really good.

Reihl: He's a pretty good kid, huh?

Mandy: Mmm hmm. [Nods head]

Reihl: Smart?

Mandy: Uh huh. [Nods head] He knew, he knew his times pretty good. He could, he could just do 'em in a flash. He was pretty good at 'em. He's a lot better than me.

Reihl: Did you, did you say you used to walk to school with him sometimes?

Mandy: Uh no, I never walked.

Reihl: Oh, you never did.

Mandy: No. I see—I seen him walk to school.

Reihl: Uh-huh.

Mandy: I never walked to—I never walked to school or to my house alone.

Reihl: Okay, and how would he get home?

Mandy: Um, usually some, if he wasn't grounded from his bike would ride his bike home. He would walk home. His dad would come and pick him up when he had his truck. Um, Rick would walk to school and pick up Aaron. They would walk back home together.

Reihl: Mmm hmm. And, and you guys get out of school at what time?

Mandy: Two twenty.

Reihl: Two twenty. And how long does it take him to get home do you think?

Mandy: Mmm probably like—we don't live too far from Lincoln. All you gotta do is go straight and turn and you're there.

Reihl: Oh.

Mandy: Probably like five minutes to get there.

Reihl: Uh-huh. Okay.

Mandy: If he was riding his bike it would only take him like two minutes. But if he was walking it would probably take him a pretty long time.

Reihl: Mmm hmm. Now, do you remember last Friday?

Mandy: Yeah.

Reihl: Okay. And you told me earlier that you go to the Alphabet Academy?

Mandy: Uh huh. [Nods head]

Reihl: And that they usually pick you up at school, right?

Mandy: Uh huh. [Nods head]

Reihl: Okay. And did they pick you up Friday?

Mandy:  Uh huh. [Nods head]

Reihl:  And you went straight to the Alphabet Academy?

Mandy:  Uh huh. [Nods head]

Reihl:  And say then you what, your mom picks you up from there?

Mandy:  Uh huh. [Nods head]

Reihl:  Okay.  And you said you picked her up about what time?

Monica:  Between three thirty and quarter to four.

Reihl:  Okay.  And you went straight home?  Or where'd you go?

Monica:  I usually call down there and I watch her walk from there down to our house.  And then I waited for my mom and dad to get home, and I went and cashed my check and came home.

Reihl:  Okay, when you got home at three thirty, um, did you notice if Rick was at home across the street?

Monica:  I didn't pay no attention.  All I saw was Aaron.

Reihl:  You saw Aaron?

Monica:  Mmm hmm.

Reihl:  You don't remember if Rick's truck was there?

Monica:  No.

Reihl:  Okay.  And, then Mandy you were telling me that when you got home that was about what time?

Monica:  From day care?

Reihl:  Yeah.

Monica:  That was around three thirty, quarter to four.

Reihl:  Okay, and that's when you saw Aaron?

Mandy:  Uh huh. [Nods head]

Reihl:  And you saw his dad?

Mandy:  Uh huh. [Nods head] His dad, he, his dad was coming from their living room into the kitchen to get something to drink.

Reihl:  Did you go over to Aaron's house or you just saw him from your house?

Mandy:  I, I, um, when I walked, when I, every day when I walk home I always see Rick walk into the kitchen or walk into the restroom or walk into his room.

Reihl:  I mean, did you see him from outside looking in or did you actually go into the house?

Mandy:  No, I um seen it from the outside 'cause when 'cause I seen him go into the kitchen.  When he came back he had a drink in his—he had, um, some um—I don't know what it was.  He had a drink in his hand but it was in a cup.

Reihl:  Okay.

Mandy:  Like usually pop, 'cause they like, they like Storm a lot.  So, probably Storm.

Reihl:  What, uh, what does Rick drive?

Mandy:  A Chevy?  He used to drive a Chevy until it broke down.

Reihl:  A Chevy what?

Mandy:  [Eyes searching, no verbal response]

Reihl: Is it a car or a truck?

Mandy: Truck.

Reihl: What color?

Mandy: Black.

Reihl: Okay.

Mandy: It's like, kinda short. I mean like it—did you see my mom's truck? Um, well, uh my mom's truck, my mom's truck's pretty big. His is probably a medium truck, you know. Kinda short.

Reihl: What was he driving Friday? Did you see that?

Mandy: Um, his truck broke down before that. He was drive—driving a white truck which was his brother's. And his brother had a car so his brother let Rick use the truck.

Reihl: Okay. Was that white truck at Rick's house Friday?

Mandy: Yeah.

Reihl: When you got home from school?

Mandy: Yeah.

Reihl: Okay. And this is about what time again?

Monica: Three thirty, quarter to four.

Reihl: Okay, so between three thirty and quarter to four—

Mandy: Yeah.

Reihl: You saw—

Mandy: Aaron and Rick.

Reihl: Okay, at the house. Did you ever see 'em leave?

Mandy:  Um, yeah, like I was on my porch and, and they let me blow bubbles. And I was blowin' my bubbles, and I seen Rick pull out and leave.

Reihl:  Okay.  Now how long, how long after—and this might be hard to guess at—'cause you probably don't wear a watch, do you?

Mandy:  Well, until my watch, well, yeah I did but my watch is in my bag and I—'cause I had to take it off when we had gym.  I just take it off.

Reihl:  So, about what time do you think they left their house, if you had to guess?

Mandy:  Um—

Reihl:  I know it's gotta be a hard question.

Mandy:  Um—

Reihl:  Was it very long after you got home?

Mandy:  Mmm, medium.  Because his mom lives pretty far away, you know.  And you know but I think it was like—I don't know.

Reihl:  Okay.

Mandy:  It was probably in like medium because you know it takes a pretty long time to get to his mom's house.

Reihl:  Well why was he going to his mom's house.  I think he told you, didn't he?

Mandy:  Um, I guess to just visit her.

Reihl:  Okay, did he talk about going to his mom's house?

Mandy:  He said that he was going to his mom's house Friday, 'cause he was gonna stay the night there to go to the field trip

Saturday. So it was probably why, and Rick probably wanted to stay a little while to talk. You know, he was, he—he wanted to go on the field trip bad. So, they were gonna leave pretty early to get to the school on time to go. But by the time Saturday when we, when we were on the bus and stuff, he was gonna be in our group, and, um, he never showed up. He wasn't there. And we didn't know why. But Saturday—Sunday when we got home with my cousins, um, 'cause we go camp—we went camping after the field trip, we just went, we came back from the field trip, and my mom drove her truck back to the, back up to our house and up to the camper and, and my grandma goes, "Did you see Aaron?" and I'm like, "No, he was supposed to be in our group, he wasn't there." And then Sunday, um, my um, my day care teacher said they showed it on TV but my grandpa didn't get, my grandpa didn't turn it on there because he, he didn't know it was they got murdered Friday night. So, I mean, and then Monday, um, Monday, Monday News Center 16 came to my house, and I was at karate 'cause I, I had practice. When we came home my grandma said News Center 16 just, just came to our house like, probably a while ago.

Reihl:  So you didn't get a chance to talk to him then, huh?

Mandy:  No.

Reihl:  So, Friday, after you got home, they left just a little bit after when you got home, right?

Mandy:  Yeah.

Reihl:  And you saw 'em leave?

Mandy:  Yeah. He pulled out.

Reihl:  And they were just together, Rick and Aaron, nobody else with 'em?

Mandy:  No one else was with them, just Aaron and Rick.

Reihl:  Okay.

Mandy:  'Cause Rick, 'cause Aaron's mom— He didn't know if Aaron's mom was home yet so Rick was thinking if his mom's not there, then Wayne's probably not there. So, he said, "I'll just drive you," and they just took off, pulled out and took off.

Reihl:  Okay.

Mandy:  And—

Reihl:  Monica, Monica, I'm sorry.

Mandy:  And Fri— and Thur—and when I was playing with them—

Reihl:  Mmm hmm.

Mandy:  There was, he had some clothes laying on his, laying on his on their swing on the front porch. Um, he had a whole bunch of clothes laying on there and I, I didn't know what they were for. You know, I thought he was gonna spend the night there Saturday and Sunday, come home Monday. Um, Sunday's rolling around and he wasn't there. Saturday, Saturday the field trip, he wasn't there.

Reihl:  Monica, you said something back at your house when I was talking to you about um, you said you'd cashed your check.

Monica:  Yeah.

Reihl:  Friday?

Monica:  Yeah.

Reihl:   And that was about what time? Was that after you come home from work?

Monica:  Shortly after I came home from work.

Reihl:  Okay.  And, what time do you think that was?

Monica:  Let's see. Probably about ten minutes till four.

Reihl:  Okay. So then you got home then about—how long were you gone to cash the check?

Monica:  Probably about fifteen minutes.

Reihl:  Okay, and when you got home, that would have put it a little after four o'clock? And was Rick still at the house then?

Monica:  I didn't pay no attention. Like I said, all I saw was Aaron. I really didn't look to see if Rick's truck was there.

Reihl:  Well, Aaron was still there when you got back after you cashed your check?

Monica:  Yeah.

Reihl:  Okay. And you don't remember if that truck was in the—

Monica:  Nuh uh, I didn't pay no attention.

Reihl: Okay, um— You said something, too, didn't you about you overheard something one time a couple months ago.

Monica:   Yeah. I don't, like I said, I don't know who the woman was. But he was standing, they were standing in their driveway. And, well he was standing in the driveway. She was sitting in the truck. And, uh, I couldn't hear what she was saying, but he was, you know, he was saying the F-word, and

F him, he don't scare me, and he was just going on and on and on. And then he, then she left, and he just went into the house.

Reihl:  This truck, what did it look like?

Monica:  It was a, it was a little black truck.

Reihl:  Do you know, do you know your vehicles? Do you know the difference between a—

Monica: Well, the lettering on the back was kinda, on the back of it was kinda like, rusted like, and you couldn't really tell what kind of car it was—

Mandy:  Um—

Monica:  —what kind of truck.

Mandy:  Aaron's dad's truck had Chevy right there. It was just printed beautifully. It was gold and it was just right on there. You could just read it, so it couldn't have been Aaron, Aaron's dad's truck, 'cause Aaron's dad's truck was, but, it was still there where he, it broke down. I mean Aaron's truck's, dad's truck was just beautiful. The Chevy was just—

Reihl:  But was this was this his ex-wife? Was this—

Monica:  I don't know.

Reihl:  —Elizabeth?

Monica:  I don't know who she was. Like I said, all I saw, all I, I never seen the woman. You know, I, I just know that she had blonde hair. Well, I seen her face, but she had blonde hair.

Reihl:  Was she a passenger in the truck?

Monica: No.  She was driving it.

Reihl: Okay.

Monica: And this was, then I saw her once a little while after that. You know, like a, I don't know, a couple weeks later. And that was the last time I seen her.

Reihl: What was she driving then?

Monica: Same thing.

Reihl: This truck?

Monica: Mmm hmm. I don't know, I don't, like I said I don't know who she was.

Mandy: Aaron's mom's, mom has um, blonde hair.

Reihl: Mmm hmm. I was just trying to see if maybe you could describe this truck. Was there anything, was it, was it a pickup truck where it has the open bed in the back or was it all closed up?

Monica: Uh, let me think. I think it was open. See, 'cause the one that that, ah, Aaron's dad used to drive had the little things that went down the side.

Reihl: Mmm hmm.

Monica: But it wasn't all closed in. It just had like little, I don't know what you'd call 'em, it went from the top all the way to the back of the truck, and it was just a short thing. This one was all open, I believe. I think it was.

Reihl: It was just like a regular pickup truck.

Monica: Yeah.

Reihl: Okay. So it wasn't like a little sport utility vehicle?

Monica: No.

Reihl: Like you see like one of those Suzuki Samurais or something like that?

Monica: No. It was—

Reihl: Kids drive a lot.

Monica: It was pretty rusted.

Reihl: Okay. All right. But you don't know whether or not that was his—

Monica: No I have no idea.

Reihl: His ex-wife Elizabeth or not? All right.

Monica: I just know that he was highly upset that day.

Reihl: Oh.

Monica: And she didn't look too happy, and she left and he went into the house.

Reihl: Okay.

Monica: Yeah, I don't even, I don't know who his ex-wife is. I mean, it could have been her, but I, I don't know.

Reihl: Okay. Was there anything else? I can't remember exactly what all we talked about at the house but, did you say that, uh, I was thinking that you said that Aaron had made some comments to you before, too, about—

Monica: Oh, he just told me the once.

Reihl: Oh.

Monica: He just told me one time that he doesn't like his step-dad. But, I just figured he was just being a kid.

Reihl: Yeah.

Monica: You know, "My mom and dad's divorced but I really don't like this guy. I don't want Wayne really to be with my mom. I'd rather, you know, him and my mom be together—"

Reihl:  Mmm hmm.

Monica:  "—than my stepdad," kinda thing. That's all I thought it was. So I just really didn't pay no attention to it.

Reihl:  Okay. Okay. All right. Well, just so I got this right then, Mandy, you got home at about three thirty, quarter of four and you saw Aaron and his dad and that white truck at his house?

Mandy:  Yes.

Reihl:  And then, Monica, you got home from cashing that check around four o'clock or a little after, and you saw them both at the house, or at least you saw Aaron?

Monica:  Yeah, I saw Aaron.

Reihl:  Okay. But you never saw 'em leave.

Monica:  No. I was in the house by the time they left.

Reihl:  Okay, and Mandy, you did see 'em leave, but you don't know exactly when it was that they left?

Mandy:  Yeah. I seen 'em leave, but, you know I didn't see no, I didn't see no bags in the truck. And when, when they left, the clothes were still there.

Reihl:  Okay. On the swing?

Mandy:  Um, yeah. 'Cause when his grandparents were there, they picked up the clothes and just threw 'em in the box.

Reihl:  Okay.

Mandy:  And we thought that he was moving, like he didn't like the neighborhood so he was moving. What we thought, and I don't know if it, I didn't know if Rick and Aaron Friday were gonna go look for a new house or go to his mom's. I

didn't know, I thought they were going to look for a new house and then come back, and you know, and go. Like, then go to his mom's. But, I didn't, I didn't know.

Reihl:  Okay. These times that you've given me today, uh, these are pretty accurate?

Monica:  Mmm hmm. Yeah, 'cause I get off work at quarter after three. And with the traffic and that, and sometimes the South Shore comes by and you gotta wait for that.

Reihl:  Mmm hmm.

Monica:  So, yeah, pretty well.

Reihl:  It's pretty much a routine that you do every day?

Monica:  Yeah.

Reihl:  Every day that you work, that is?

Monica:  Yeah. Sometimes on, sometimes I have to stay a couple minutes after, so, I get home a little later. And that was just so happen to have been one of the days that was a little bit later.

Reihl: Okay. All right. I, I don't have any more questions that I can think of at the moment. Do you have anything else that you can think of? Maybe I overlooked, that I have overlooked?

Monica:  No. Do you?

Mandy:  [Shakes head]

Reihl:  I thank you very much for coming down. I'll take you back home now. The time is, uh, three twenty PM. [Pause] I told you that would take you about fifteen, twenty minutes.

Mandy:  [Pointing to ceiling] Is that your camera?

Reihl:  It's up there.

Mandy:  Oh, there it is. I thought it was—it's in that vent right there.


[END OF INTERVIEW]

HAMILTON, *Circuit Judge*, joined by EASTERBROOK and
SYKES, Circuit Judges, dissenting. The Indiana courts ex-
cluded as evidence an unsworn, *ex parte* interview of a nine-
year-old witness who later disclaimed any memory of the in-
terview. That decision did not violate petitioner Kubsch's con-
stitutional rights. The exclusion certainly was not an unrea-
sonable application of "clearly established Federal law, as de-
termined by the Supreme Court of the United States." 28
U.S.C. § 2254(d)(1).

To overturn Kubsch's three murder convictions, the en
banc majority has crafted a new rule so narrow and case-spe-
cific as to be good apparently only for this case: "Only if all of
the factors the Court has specified, and we have described,
come together must the evidence rule yield." Ante at 34. That
qualification is a red flag signaling a decision in conflict with
§ 2254(d)(1). True, the majority has built its argument from
texts in the volumes of the *United States Reports*, working from
*Chambers v. Mississippi*, 410 U.S. 284 (1973), and its progeny.
But that line of cases requires careful balancing of many case-
specific factors, which the majority says must all point in the
same direction for a rule of evidence to yield. I disagree with
the majority's new, case-specific rule, but the decisive point in
this habeas case is that that new rule is not *compelled* by those
precedents. Fair-minded judges can disagree with it.

While habeas relief does not require "virtual identity" be-
tween the current case and a Supreme Court decision, the
problem here actually runs much deeper. The majority has not
identified *any* case in *any* American jurisdiction where such
an unsworn, *ex parte* witness statement would even be admis-
sible as substantive evidence, let alone that the state courts'

exclusion of the statement here violated clearly established constitutional law. I respectfully dissent.

The Supreme Court repeatedly reminds the lower federal courts in habeas corpus cases that we must allow state court decisions to stand unless "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Accord, e.g., *Woods v. Etherton*, 578 U.S. —, 136 S. Ct. 1149 (2016) (summary reversal; reasonable judges could disagree on whether appellate counsel was ineffective); *White v. Wheeler*, 577 U.S. —, 136 S. Ct. 456 (2015) (summary reversal; reasonable judges could disagree on whether judge properly excused juror for cause); *Lopez v. Smith*, 574 U.S. —, 135 S. Ct. 1 (2014) (summary reversal; Supreme Court case law did not clearly establish right to relief).

The majority's narrow rule conflicts with both specific rules limiting hearsay evidence and the general principles that underlie those rules. Most hearsay is inadmissible because it is less reliable than live testimony and therefore less relevant in the search for truth. See *Anderson v. United States*, 417 U.S. 211, 220 (1974) ("The primary justification for the exclusion of hearsay is the lack of any opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is introduced into evidence."). As explained below, the *Chambers* ruling itself was narrow and case-specific. The broader principles that underlie that ruling give broad deference to authors of rules of evidence, but allow for rare constitutional exceptions to those rules under compelling circumstances. The guidance from those principles is general,

though, and does not compel a ruling in a particular case like this one.

Note that the Supreme Court itself has never relied on the *Chambers* line of cases to grant habeas relief. That fact alone suggests that the majority's result is not dictated by Supreme Court precedent. Instead, the Court has summarily reversed a grant of habeas relief where the court of appeals, like the majority here, read *Chambers* too broadly. *Nevada v. Jackson*, 569 U.S. — 133 S. Ct. 1990 (2013). We should affirm the denial of relief here.

On September 18, 1998, petitioner Wayne Kubsch murdered his wife Beth, her ex-husband Rick Milewski, and their son Aaron Milewski. Beth had been stabbed eleven times. Her face and head were covered with duct tape. Her hands and feet were also bound with duct tape. Aaron and Rick had also been stabbed, and each had been shot in his mouth.

The case against Kubsch was circumstantial but powerful. He had motive and opportunity. Numerous items of evidence pointed in his direction. The murders were committed in the basement of Kubsch's home, which was locked after the murders. The only people who had keys were Kubsch, Beth, and her other son who found Rick's and Aaron's bodies. The murders were committed with a knife from the kitchen. The duct tape binding Beth matched a tape package in Kubsch's car. Cloth fiber from the tape roll matched the carpet of Kubsch's car. A receipt for purchase of the duct tape, dated three days before the murders, was also found in Kubsch's car. A kitchen pan had Beth's blood on it. It is not plausible that the killer was a stranger who counted on tools found in the Kubsch home—the knife, the pan, and the duct tape—to carry out the murders.

In addition to this physical evidence, "most damning to Kubsch was a series of lies, inexplicable omissions, and inconsistencies in what Kubsch told the police and later testified on the witness stand, and these statements—in conjunction with a few pieces of circumstantial evidence—are what almost assuredly got Kubsch convicted." *Kubsch v. Superintendent*, No. 3:11CV42-PPS, 2013 WL 6229136, at *1 (N.D. Ind. Dec. 2, 2013). Kubsch spoke with the police a few hours after the murders. At that time, the bodies of Aaron and Rick had been discovered, but Beth was still missing. Kubsch was calm. He expressed no concern about his missing wife's safety. Before her body was found, he told a friend and his wife that Beth was "gone," which both understood to mean that Beth was dead. Even the police did not know that yet. And even if Kubsch's use of the word "gone" could be explained away as ambiguous, Kubsch also told his friend that Aaron and Rick had been stabbed *and shot*. Authorities did not find the gunshot wounds until autopsies were conducted the next day.

As the district court summarized, Kubsch's account of his movements and communications the day of the murders changed repeatedly. Every time the police confronted him with new evidence contradicting his earlier stories, he concocted new versions. (More detailed accounts of those changes and contradictions can be found in the panel opinion, *Kubsch v. Neal*, 800 F.3d 783, 790–92 (7th Cir. 2015), and in the district court's careful opinion, *Kubsch*, 2013 WL 6229136, at *5–6.)

The jury convicted Kubsch of all three murders and recommended the death penalty. The judge sentenced Kubsch to death. The Indiana Supreme Court affirmed on direct appeal.

The state courts denied post-conviction relief; the district court denied habeas relief, as did the appellate panel.

The en banc majority now reverses the convictions and orders a new trial for Kubsch based solely on the exclusion of Amanda Buck's recorded interview with the police four days after the murders. Amanda's statement was exculpatory. If the statement were factually accurate, then Kubsch would be innocent. The majority agrees that Amanda's statement was not admissible under Indiana evidence law. But Amanda's recorded interview is the only available information tending to corroborate Kubsch's claim of innocence. The majority finds not only that its exclusion deprived him of his right to due process of law, but also that no fair-minded judge could disagree on the basis of U.S. Supreme Court decisions.

I find no error in the exclusion of Amanda's statement, let alone a violation of constitutional law clearly established by Supreme Court decisions. *Chambers* and its progeny do not show that the state court's decision was "beyond any possibility for fair-minded disagreement," *Richter*, 562 U.S. at 103. Amanda's statement was not under oath, not subject to cross-examination, and not corroborated.[1]

*Chambers* itself is the Supreme Court case closest to this one, but the differences are so pronounced and important that they belie the majority's claim that *Chambers* clearly required admission of Amanda's statement. The issue in *Chambers* was the admissibility of witness McDonald's *four* confessions to

---

[1] Amanda's statement was disclosed to Kubsch and his attorneys. As important as it now turns out to be for the majority, it is remarkable that Kubsch's first team of able and capital-qualified lawyers did not even try to admit it during his first trial, in 2000.

the fatal shooting of Officer Aaron Liberty. One confession was written and under oath. The other three were spontaneous statements to three different friends. McDonald testified at trial and was available for cross-examination. McDonald's confessions were also corroborated by other witnesses. One testified that he saw McDonald fire the fatal shot. Another saw McDonald with a gun immediately after the fatal shot, and a third knew that McDonald owned the type of gun used in the murder. The state court had stopped Chambers from impeaching McDonald, invoking the old "voucher rule" that barred a party from impeaching his own witness. McDonald's confessions to his three friends were excluded as hearsay.

The Supreme Court reversed Chambers' convictions, holding that the *combined* effect of the voucher and hearsay rules violated Chambers' right to due process. 410 U.S. at 302–03. The Court noted that declarations against interest have long been treated as sufficiently reliable to qualify for an exception to the hearsay rule. *Id.* at 298–99. The Court also found that the excluded confessions "bore persuasive assurances of trustworthiness" that brought them "well within the basic rationale of the exception for declarations against interest" and were "critical to Chambers' defense." *Id.* at 302. The Court concluded: "In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id*. The combination of the limits on impeachment and exclusion of the confessions led the Court to hold that "under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." *Id*. at 303.

That narrow "facts and circumstances" language indicates that "*Chambers* was an exercise in highly case-specific error correction." *Montana v. Egelhoff*, 518 U.S. 37, 52 (1996) (plurality opinion of Scalia, J.). There was a deeper principle at work, but the principle is too general to mandate habeas relief in this case. The principle was best articulated in *Rock v. Arkansas*: rules of evidence restricting the right to present a defense cannot be "arbitrary or disproportionate to the purposes they are designed to serve." 483 U.S. 44, 56 (1987). The Court later explained that it has struck down as "arbitrary" those restrictions that "excluded important defense evidence but that did not serve any legitimate interests." *Holmes v. South Carolina*, 547 U.S. 319, 325 (2006).

This general standard does not readily decide individual cases, let alone dictate their results so clearly as to support habeas relief. The *Chambers* line of cases also recognizes that "'state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.'" *Jackson*, 133 S. Ct. at 1992 (summary reversal of habeas relief), quoting *Holmes*, 547 U.S. at 324, quoting in turn *United States v. Scheffer*, 523 U.S. 303, 308 (1998).

While the majority correctly identifies some similarities between *Chambers* and this case, there are critical differences on points the Court emphasized in *Chambers* itself. These differences should foreclose habeas relief. Even if one can look past the Court's reliance on the *combined* effects of the voucher and hearsay rules in *Chambers*, see 410 U.S. at 302–03, the reliable out-of-court confessions of witness McDonald are readily distinguishable from Amanda's recorded statement here. Amanda's statement lacked meaningful corroboration, and she was not subject to cross-examination about her statement.

The unusual extent of corroboration was central to the reasoning in *Chambers*. McDonald's four independent confessions corroborated each other. They were also corroborated by the testimony of other witnesses: one who saw McDonald shoot the officer, another who saw him with a gun immediately afterward, and yet another who knew he had owned a gun like the murder weapon and later replaced it with another similar gun. *Id.* at 293 n.5, 300.

In this case, there is essentially no corroboration of Amanda's statement on the critical point, which is whether Aaron and Rick were at their home alive and well between 3:30 and 3:45 p.m. on the day they were murdered. While Amanda's mother initially indicated that she also saw Aaron at home that afternoon, she later corrected her statement. It is easy to understand how Amanda and her mother could have mixed up their dates. The sight of a neighbor at his house is not the kind of unusual event likely to stick clearly in one's memory. In any event, the mother's statement was never even offered as evidence. It also could not have been admitted as substantive evidence to corroborate Amanda's statement. The absence of meaningful corroboration of Amanda's recorded statement distinguishes this case from *Chambers*. See also *Rice v. McCann*, 339 F.3d 546, 550 (7th Cir. 2003) (affirming denial of habeas relief in part because state court found hearsay was not corroborated).

The availability of cross-examination was also central to *Chambers*: "if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury." 410 U.S. at 301.

In this respect, as well, this case is quite different. Unlike the declarant in *Chambers*, Amanda was unavailable for cross-examination. She took the stand at trial briefly but testified that she did not remember being interviewed by the police or what she said to them. "A declarant is considered to be unavailable as a witness if the declarant … testifies to not remembering the subject matter[.]" Ind. R. Evid. 804(a)(3); Fed. R. Evid. 804(a)(3).

Other circumstances here do not serve as a substitute for cross-examination. During the recorded interview, Amanda was never pushed on the critical details—the date and time she saw Aaron and Rick at their home—or the possibility that she might be mistaken. The interviewing officer was simply taking her account as she spoke in an interview in the early stages of the investigation. Amanda was not under oath, and the interviewer did not test her story to see how certain and accurate she might have been. His gentle questioning, which was surely appropriate for his purpose at the time, was not remotely like cross-examination of the sole alibi witness in a triple-murder trial with stakes of life and death.

By way of comparison, when a witness is unavailable, even former *testimony* is admissible under the rules of evidence only if it is offered against a party who had both an opportunity and a similar motive to develop that witness's testimony by direct, cross-, or redirect examination. Ind. R. Evid. 804(b)(1); Fed. R. Evid. 804(b)(1).

If the State decides to undertake the daunting task of a third trial of Kubsch nearly twenty years after the murders, the majority's decision will require that Amanda's recorded statement be admitted. The State will not be able to test its

accuracy through meaningful cross-examination. The prosecutor will have to question a witness who, as early as 2005, did not even remember making the statement. See Fed. R. Evid. 804(a)(3) advisory committee note ("the practical effect" of lack of memory "is to put the testimony beyond reach"); 2 *McCormick on Evidence* § 253 (7th ed.) (declarant who does not remember the subject matter of her testimony "is simply unavailable by any realistic standard").

In short, Amanda's unsworn, uncorroborated, and *ex parte* statement simply is not comparable to the McDonald confessions that were excluded improperly in *Chambers*. And the critical point in this habeas case is that even if a reader might be persuaded that *Chambers* did not actually depend on the corroboration and opportunity for cross-examination that the *Chambers* Court itself emphasized, these differences show that the majority's extension of *Chambers* to this case is not beyond fair-minded disagreement.

The majority also finds supposedly "close parallels" in the Supreme Court's decisions in *Green v. Georgia*, *Crane v. Kentucky*, and *Holmes v. South Carolina*, but all are easy to distinguish. They do not support habeas relief in this very different case.

In *Green v. Georgia*, 442 U.S. 95, 96–97 (1979), defendant Green had been convicted of capital murder. At sentencing, he offered his co-defendant's hearsay admission that the co-defendant had actually killed the victim. That same statement had been admitted as reliable enough to justify the co-defendant's death sentence. In Green's case, though, the state courts excluded the same statement. The Supreme Court rejected this unfair asymmetry, but there is no such unfair asymmetry

here. The prosecution could not have used Amanda's recorded statement if it had been inculpatory. Cf. *Crawford v. Washington*, 541 U.S. 36, 68–69 (2004) (confrontation clause violated where prosecution used witness's testimonial statement "despite the fact that [defendant] had no opportunity to cross-examine her").

*Crane v. Kentucky*, 476 U.S. 683, 691 (1986), offers no additional support for the majority. Defendant Crane presented evidence about the length and manner of the interrogation that led to his confession. He wanted to show that the circumstances made his confession unreliable. The evidence was competent and properly admissible, except for one unusual substantive rule of state law. After a court had found a confession voluntary, the rule excluded otherwise competent and admissible evidence about the circumstances of the confession. The violation of the defendant's rights was so clear that the Court could not decide whether to base its ruling directly on the due process clause under *Chambers* or on the compulsory process or confrontation clauses of the Sixth Amendment. *Id.* at 690. The Court emphasized that the evidence was "competent, reliable evidence bearing on the credibility of a confession." *Id.* That ruling on otherwise admissible evidence is not comparable to the state court ruling here, which applied a common rule of evidence to exclude hearsay.

The majority also finds a "close parallel" with *Holmes v. South Carolina*, 547 U.S. 319, 330 (2006), where the defendant used the familiar tactics of attacking the reliability of the state's forensic evidence and offering evidence that someone else committed the murder. The state courts applied a unique rule of state law that barred the defendant from introducing

evidence of third-party guilt when the prosecution had introduced forensic evidence that, if credited, was strong proof of the defendant's guilt. That circular logic had been applied to bar the defense from offering otherwise admissible evidence. The Supreme Court held that the unique rule was arbitrary and unconstitutional. *Id.* at 331. At the same time, however, the Court made clear how unusual the case was, noting that "[s]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Id.* at 324, quoting *Scheffer*, 523 U.S. at 308, and citing *Chambers* and *Crane*.

The odd and unfair state-court rules in *Green*, *Crane*, and *Holmes* simply are not comparable to the Indiana court's routine application of Rule 803(5) in Kubsch's case, a rule that is consistent with federal law and many other states' rules of evidence. Again, the majority has not identified any case in any American court that has admitted such an unsworn and *ex parte* interview as substantive evidence when the witness was not available for cross-examination.

Toward the end of its opinion, the majority makes two observations about Indiana evidence law that warrant brief comment. First, the majority suggests that the video recording of Amanda's interview "missed qualifying for admission under Indiana Evidence Rule 803(5) by just a hair." Ante at 31. The video "missed" because Amanda was unable to vouch for its accuracy, where at least her claim of accuracy would have been subject to cross-examination. The vouching requirement is not a technicality. It ensures that the hearsay exception does not swallow the rule. Cases should be decided based on testimony to the jury, not recorded *ex parte* interviews.

After this en banc decision, however, trial courts in Indiana and elsewhere may hesitate to enforce the hearsay bar and other settled evidentiary rules when confronted with potentially exculpatory but plainly inadmissible evidence. Defense counsel now have a solid argument, that such evidence should be placed before the jury on expanded *Chambers* grounds. Trial judges reading the majority's opinion might say no on the theory that the ruling here is so narrow and case-specific. But that's what the Supreme Court said in *Chambers*, too. If cautious trial courts accept the new defense argument based on *Kubsch*, the integrity of the criminal trial process will be undermined. Trials should be decided based on admissible evidence from the witness stand, not *ex parte* statements by non-parties in low-pressure settings, especially where those non-parties are not available for later cross-examination.

The majority also suggests the Indiana courts treated Kubsch unfairly based on a "troubling lack of consistency in the application" of Rule 803(5). Ante at 32. The cases the majority cites do not support the criticism. The only Indiana Supreme Court decision cited, *Small v. State*, 736 N.E.2d 742, 745 (Ind. 2000), allowed admission of the witness's *deposition transcript*. Such use of prior testimony is routine. See Fed. R. Evid. 804(b)(1) (allowing use of former testimony of unavailable witness when offered against party who had opportunity and similar motive to develop testimony); Ind. R. Evid. 804(b)(1) (same). *Small* relied on Rule 803(5), but there was no indication that the witness lacked a memory of giving the deposition (as Amanda lacks a memory of her recorded interview).

Rather, like many witnesses, the witness in *Small* did not remember her specific deposition answers.[2]

In another interesting rhetorical device, the majority attempts to shift to the State the burden of disproving Amanda's statement, suggesting for example that the State could have subpoenaed the mother's bank for her deposit records. Ante at 30. With respect, that was not the State's burden when the defense could not support the admissibility of the unsworn, uncorroborated, *ex parte* witness interview. If the majority's decision stands, the State will now have to dig into those details nearly twenty years after the fact.

Finally, it is clear that the majority's decision is driven in large part by the life-and-death stakes in this case. See ante at 2, 28–29, 34. The stakes may make this case hard on judges, but they do not change the rules of evidence, nor do they justify a departure from ordinary deference under § 2254(d)(1). See *White v. Wheeler*, 577 U.S. at —, 136 S. Ct. at 462 ("this Court again advises the Court of Appeals that the provisions

---

[2] The majority also cites *Impson v. State*, 721 N.E.2d 1275, 1282–83 (Ind. App. 2000), a pre-*Crawford* case that dealt with statements by a victim of domestic violence who was a reluctant witness. Her earlier statements bore such strong indications of reliability that the state court found no prosecutorial misconduct in efforts to impeach her exculpatory testimony in her husband's trial. The majority also cites *Flynn v. State*, 702 N.E.2d 741, 744–45 (Ind. App. 1998), another pre-*Crawford* case where a witness— a passenger in the defendant's getaway car—gave statements to police at the scene of the defendant's arrest. The defendant had the opportunity to cross-examine her in her deposition, in a pretrial hearing, and at trial. Under those circumstances, the state court held that a taped statement by the witness was admissible under Rule 803(5). The indicia of reliability in *Flynn* were plainly not present here. In any event, the rulings in both cases would need further consideration after *Crawford*.

of AEDPA apply with full force even when reviewing a con-
viction and sentence imposing the death penalty").

Exclusion of reliable, critical, and admissible evidence is
improper even if the result is "only" years or a lifetime in
prison. By the same token, exclusion of inadmissible evidence
is proper even when—especially when—the stakes are higher.
Exclusion of such evidence is proper no matter which side of-
fers it.

The rules of evidence, whether in codes or case law, inevi-
tably pose a risk of excluding some reliable and probative ev-
idence in some cases. Our criminal justice system is not infal-
lible, but the rules of evidence have evolved to try to improve
accuracy and fairness. The residual risk of error in capital
cases is deeply sobering for all of us with roles in the criminal
justice system. That risk offers a powerful policy argument
against the death penalty. It does not provide a reason to dis-
regard rules of evidence that apply to both sides and have
been designed to ensure fair and reliable evaluation of evi-
dence. The majority's new, narrow, and case-specific excep-
tion is not compelled by Supreme Court precedent and does
not support habeas relief here.