In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 15-2577

IVAN JOHNSON,

*Petitioner-Appellant,*

*v.*

KAREN JAIMET,

*Respondent-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 14 C 50172 — **Frederick J. Kapala**, *Judge.*

---

ARGUED DECEMBER 6, 2016 — DECIDED MARCH 30, 2017

---

Before WOOD, *Chief Judge*, and ROVNER and SYKES, *Circuit Judges*.

WOOD, *Chief Judge*. Douglas Keefer's badly beaten body was found by police in Keefer's own backyard in Rock Falls, Illinois, the morning of November 27, 2006. A jury convicted Ivan Johnson of Keefer's murder. While Johnson admits he beat Keefer the night before, in the same backyard, he insists that he did not kill him. Keefer's actual murderers, Johnson

says, were two men with baseball bats who attacked Keefer later that night, in the same spot.

Johnson's theory apparently came from Dustin Manon, a one-time occupant of the Whiteside County Jail. Manon told police that his cellmate there, Donnie Masini, told him that Masini had hired two men to kill Keefer with bats and that they did so. Unsurprisingly, Masini denied making the statement when police questioned him. The trial court barred Johnson from introducing Masini's hearsay statement, reasoning that it was too unreliable to allow into evidence. The Illinois Appellate Court affirmed.

After exhausting other options, Johnson now seeks habeas corpus relief. He argues, as relevant here, that the state court's exclusion of the hearsay evidence was an unreasonable application of *Chambers v. Mississippi*, 410 U.S. 284 (1973). The district court denied Johnson's petition, but it granted him a certificate of appealability. We agree with our colleague that the state court's decision did not run afoul of *Chambers* and thus that Johnson is not entitled to habeas corpus relief.

**I**

At Johnson's jury trial, the prosecution and the defense agreed that Johnson repeatedly punched an unarmed Keefer on the evening of Sunday, November 26, 2006. The critical difference between their stories lay in the degree to which Johnson beat the victim. Johnson argued that he could not have, and did not, cause Keefer's death, while the prosecution maintained that he did. Johnson unsuccessfully sought to introduce Manon's report of Masini's confession. Without that evidence before it, the jury resolved the factual question in the prosecution's favor.

Because the Antiterrorism and Effective Death Penalty Act (AEDPA) governs this case, the findings of the state court are entitled to substantial deference. See 28 U.S.C. § 2254(d). We therefore begin by recounting the prosecution's version of events. The state argued that Johnson beat and killed Keefer after a dispute about drugs and money. Marie Schlosser, a witness to the attack, testified that the two men started arguing about money shortly after Johnson showed up at Keefer's house on the fateful evening. Earlier that weekend, Schlosser and a pair of men, all from Chicago, teamed up with a man known as "Little C" to sell drugs in the Rock Falls area, in northwestern Illinois. Johnson and Keefer visited the dealers in their hotel room at different times that weekend. On Sunday, Schlosser and Little C drove to Keefer's house to sell more drugs, but only Little C went inside. He returned to the car where Schlosser was waiting a few minutes later, claiming he had been robbed. He then made a phone call in which he repeated the accusation.

But if there was a robber, it apparently was not Keefer, who came outside soon after Little C returned to the car. Little C demanded that Keefer tell him where the man who robbed him lived or that Keefer cover the cost of the stolen drugs. At this point, according to Schlosser, Johnson arrived and started arguing with Keefer. Johnson reportedly told Keefer that "we don't play about our money" and then began punching Keefer. It was a one-way fight; Keefer did not hit back, as Johnson acknowledged at trial. Instead, Schlosser recalled, Keefer ran behind a parked car, presumably to try to evade the beating. Johnson followed. Schlosser reported that he knocked Keefer to the ground, striking him in the face repeatedly and kicking him at least once while he was prone. Eventually Johnson drove away, leaving Keefer on the ground.

Schlosser too left the scene. She said that she and her friend returned that evening to see if Keefer was still there—and "see if he was really dead." She saw Keefer in the same spot where he had lain when she left the yard shortly after Johnson's attack, but she did not approach him.

Johnson recalled the evening differently. He testified that Keefer was arguing with Little C at Keefer's place Sunday evening when Johnson arrived. Johnson said he approached the pair and told Keefer to cool down. Keefer did not; instead, he started arguing with Johnson, telling him that "if anybody gonna take a whippin' it's gonna be" Johnson. With that, Keefer "threw up his guards." Johnson said this was a sign to fight, and so Johnson did. Johnson admitted that he punched Keefer when he was standing and continued after Keefer fell to the ground. But Johnson acknowledged Keefer did not return any blows or even swing back. Johnson also admitted that he had lied to police earlier when he said that Keefer also threw punches and that Little C had also struck Keefer. Johnson explained that he told police that Keefer struck back "to make it look good on [his own] behalf." By Johnson's own admission, then, he was the sole combatant in the fight with Keefer. The only difference between his account and the state's was the brutality of the beating he administered.

One way or the other, the fight must have ended by 9 p.m., because Keefer's friend, Vern Williams, arrived at Keefer's empty house about that time. Williams found it odd that Keefer's house was unlocked, yet Keefer was nowhere to be found. Williams waited inside Keefer's residence until about 2 a.m. Monday, at which point he wrote Keefer a note and left. Williams never looked in the back yard.

A Rock Falls police officer was dispatched to Keefer's house around 10 a.m. Monday to investigate a report of a man lying in the back yard. There the responding officer, Jeremy Vondra, found Keefer dead. At trial, Schlosser testified that a police photograph of the scene where police found Keefer's body showed that Keefer's body was just where Johnson had left him the night before.

An autopsy showed that Keefer had extensive bruising on his face and neck, along with a broken jaw and a fractured throat bone. The forensic pathologist who conducted the autopsy said that Keefer's injuries were consistent with being punched in the face, falling to the ground, and being punched while prone. He noted that most of Keefer's bruises were round—like those that would result from a punch—but two bruises, along his jaw, were linear. These contusions could have resulted from being struck with a straight object, such as a rod, a piece of wood, or a shoe. Keefer's cause of death was neurogenic shock, brought on by blunt force trauma to the head and neck. The trauma triggered a hemorrhage inside his skull. The pathologist theorized that blows to Keefer's head while he was on the ground—which was so hard that his body could not absorb the strikes—might have caused his death.

On January 18, 2007, Johnson was indicted on four counts of first-degree murder for Keefer's death. Before the start of trial, the prosecution moved to exclude the hearsay testimony from Manon as inadmissible. See ILL. R. EVID. 802. Johnson wanted Manon to testify about what Masini allegedly told him about Keefer's murder. As we noted, the defense's theory was that it was two men with baseball bats who actually killed Keefer, by attacking him later Sunday evening, after Johnson had fled the scene. This account attributed the two linear

bruises to bats, not something like the kick to which Schlosser had referred.

The only problem with Johnson's theory was an utter lack of evidence backing it up. Manon was his sole source, but all he had was hearsay from Masini, recounted to Manon while Manon was in jail facing obstruction of justice charges. There Masini supposedly told him that Masini had hired two men to "take [Keefer] out" with baseball bats and that he had "got" Keefer. Manon added that Masini had asked him to blow up a woman's car and burn down her house. The targeted woman had been the subject of a running dispute between Keefer and Masini. Indeed, apparently that was why Masini was in jail: Police arrested him in October 2006, after the woman reported that Masini had shot Keefer, and investigating officers found a loaded gun at Masini's home. Manon said Masini gave him a map showing the location of the woman's house during this conversation.

Manon had first reported these statements from Masini to the police around 9 a.m. Tuesday, November 28, less than three hours after Manon had been released from jail on bond. This was almost 24 hours *after* police found Keefer's body, but several hours *before* the local newspaper first published a story about Keefer's death that afternoon. Manon gave the police a hand-drawn map that showed the woman's house—artwork from Masini, he claimed. But there were "no particulars as to when [Masini's] statement [to Manon] was made other than it was made within 24 hours of Doug Keefer's death," as the trial court noted. The news would have traveled fast, under the defense's theory, because Masini needed to hear of the successful attack and then share the news with Manon before Manon was released from jail around 6:30 a.m. Tuesday.

Johnson argued that this hearsay was admissible under the due process exception established in *Chambers v. Mississippi*, 410 U.S. 284 (1973), for certain statements against penal interest. Masini's testimony, he urged, was highly reliable. The Illinois court evaluated this argument but concluded that "justice d[id] not require" the Masini hearsay to be admitted. Following a jury trial in Whiteside County, Johnson was convicted of first-degree murder and sentenced to 35 years in prison.

On direct appeal, the Illinois Appellate Court affirmed the exclusion of the evidence. Citing *Chambers*, it reasoned that the hearsay statement lacked sufficient indicia of reliability to require it to be allowed in at trial. The court noted the absence of any indication that Masini and Manon were more than cellmates; nothing suggested that they had a personal relationship. Furthermore, nothing corroborated the hearsay; the two linear bruises could have resulted from any kind of a linear object, not just a bat. Moreover, most of Keefer's bruises were consistent with punches. The court also pointed to the evidence indicating that Keefer's body was "unmoved from where it was located when [Johnson] left the crime scene." Masini's purported motive to kill Keefer—their dispute about a woman—was of no help because it did not relate specifically to Masini's purported hiring of men with baseball bats.

Further counseling against admission was the fact that Masini would be "unavailable" for cross-examination. During the murder investigation, Masini denied making the statements Manon attributed to him. He also disclaimed any responsibility for Keefer's death. The appellate court assumed that if Masini had been called to testify, he would have asserted his Fifth Amendment privilege or denied making the

statement, making him "unavailable" in the evidentiary sense of the word. This conclusion parted ways with the trial court's analysis. That court thought that there was ample opportunity to cross-examine Masini, who was incarcerated again by then. The only factor weighing in favor of admissibility, in the Illinois Appellate Court's view, was the fact that Masini's statement was against his penal interest. Overall, the court concluded, the hearsay statement was too unreliable to be admitted.

After exhausting his appeals in state court, Johnson filed his federal habeas corpus petition on August 6, 2014. See 28 U.S.C. § 2254. The district court denied the petition on July 10, 2015, but certified for appeal the question whether the Illinois court denied Johnson his right to present a defense by excluding the hearsay that implicated another person.

## II

Our review of Johnson's petition is governed by AEDPA, which strictly limits the circumstances in which a federal court may grant relief to a petitioner whose claim has been adjudicated on the merits in state court. Johnson relies on § 2254(d)(1), which allows a federal habeas court to grant relief if the state court's decision is "contrary to, or involves an unreasonable application, of clearly established federal law." He argues that the state court unreasonably applied *Chambers* when it excluded Manon's account of Masini's admission.

A state court decision "involves an unreasonable application of [the Supreme] Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). To succeed, Johnson must do more than

show that the state court made a mistake. *McManus v. Neal*, 779 F.3d 634, 649 (7th Cir. 2015). Rather, he must show that the Illinois court's decision was "so erroneous as to be objectively unreasonable." *Id*. (internal quotation and citation omitted). Under this demanding standard, a petitioner's claim fails if "fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal citation and quotations omitted).

## A

As the Illinois Appellate Court correctly observed, *Chambers* provides the controlling Supreme Court precedent. *Chambers* similarly concerned the exclusion of hearsay evidence of another person's confession to a murder. The murder defendant in that case, Leon Chambers, had sought to introduce evidence from third parties that another man, Gable McDonald, had repeatedly confessed to the crime. 410 U.S. at 292–93. But the state court blocked Chambers from using the statements at trial by application of a state evidence rule prohibiting hearsay, despite the existence of evidence that corroborated the out-of-court statements. *Id*. at 298. Its evidentiary ruling prevented the jury from considering the defense's strongest evidence that someone other than Chambers was responsible for the murder. *Id*. at 292–93.

The Court held that the state court's hearsay exclusion violated Chambers's due process right to present a complete defense. *Id*. at 298–300. It did so notwithstanding the fact, which it acknowledged, that hearsay evidence as a general matter "lack[s] the conventional indicia of reliability." *Id*. at 298. Rules barring hearsay are permissible because they protect triers of fact from considering "untrustworthy information." *Id*. at 298 (citing *California v. Green*, 399 U.S. 149, 158

(1970)). But when hearsay statements are made and offered "under circumstances that provid[e] considerable assurance of their reliability," that justification for exclusion disappears. See *Chambers*, 410 U.S. at 300–01.

Under *Chambers*, it is necessary, though not sufficient, for critical hearsay of this type to be reliable. Rather than pre-scribing a litmus test for reliability, however, *Chambers* in-structs trial courts to determine reliability by considering all the circumstances, including such points as whether the state-ment was made by a close acquaintance; whether any evi-dence corroborates the statement; whether the statement was against the declarant's penal interests; and whether the de-clarant will be subject to adequate examination. *Id*.

In the decades since *Chambers*, the Supreme Court has re-mained steadfast in its recognition that states have "broad lat-itude under the Constitution" to restrict the admission of ev-idence in criminal trials, but at the same time that there will be cases in which the defendant's due process rights must override those rules. *Holmes v. South Carolina*, 546 U.S. 319, 324. (2006); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987); see *Kubsch v. Neal*, 838 F.3d 845, 855–56 (7th Cir. 2016) (*en banc*) (explain-ing that "*Chambers* was not a one-and-done opinion" and summarizing subsequent Supreme Court precedent). We must decide on which side of the line Johnson's case falls.

B

The Illinois Appellate Court was not satisfied that Manon's hearsay testimony had sufficient "indicia of reliabil-ity." Johnson argues, in essence, that we must take into ac-count both how reliable and how essential it was. He then turns to the latter factor and urges that the exclusion of his

evidence had the effect of denying him a meaningful oppor-
tunity to present a complete defense. It did so by preventing
him from showing that someone else was responsible for
Keefer's murder. See *Crane v. Kentucky*, 476 U.S. 683, 690
(1986). Given the wealth of evidence against Johnson, includ-
ing Johnson's admission that he beat Keefer right before he
died, his best and only hope was to suggest that someone else
was responsible. For purposes of this discussion, we will as-
sume that the hearsay was critical to Johnson's defense and
focus on reliability.

We look first at the question whether Masini was available
for cross-examination. The Illinois trial court said yes, but the
state appellate court disagreed. The appellate court thought
that Masini "likely … would have either asserted his fifth
amendment right against self-incrimination, or would have
continued to deny having made the statement." That, it said,
would have made him effectively unavailable. And because
the operative decision for our review is that of the last state
court to adjudicate Johnson's claim on the merits, we need not
concern ourselves with the trial court's assessment. *Makiel v.
Butler*, 782 F.3d 882, 896 (7th Cir. 2015).

In our court, the respondent warden concedes that the ap-
pellate court's determination that Masini was "unavailable"
was incorrect; indeed, this was one of the reasons why the dis-
trict court granted a certificate of appealability to Johnson.
Masini could have been put on the stand "in order that his
demeanor and credibility may be assessed by the jury." *Cham-
bers*, 410 U.S. at 298. To the extent it matters, Masini's where-
abouts apparently were known, because he told the police
that he did not make the statement Manon attributed to him,
and it appears that Masini was incarcerated at the time of

Johnson's trial. For present purposes, therefore, we treat this part of the Illinois Appellate Court's decision as erroneous.

But as we already have noted, the fact that a decision is in error does not necessarily make it "unreasonable." To begin with, the finding that Masini was available was not the only reason that the state court gave for finding the hearsay evidence to be insufficiently reliable. Moreover, AEDPA requires the federal court to give deference to the state court's decision, as opposed to its reasoning. See *Harrington*, 562 U.S. at 98–99; *Makiel*, 782 F.3d at 907. A "bad reason does not necessarily mean that the ultimate result was an unreasonable application of established doctrine." *Makiel*, 782 F.3d at 906 (quoting *Bradley v. Pfister*, 711 F.3d 818, 827 (7th Cir. 2013)). We thus move on to the other reasons offered by the state court in support of its finding of unreliability: the absence of evidence corroborating the hearsay, and the superficial relationship between Manon and Masini.

Johnson argues that there was evidence corroborating the hearsay, but that the state court disregarded it. He points to the linear contusions on Keefer's jaw; Masini's knowledge of Keefer's death before it was reported in the media; and Masini's motive to kill Keefer as part of their alleged dispute about the woman. The state court reasonably concluded, however, that this evidence has little or no bearing on the hearsay Johnson sought to introduce.

First, there is no proof of what caused the two linear contusions. While the pathologist opined that they *could* have been caused by a bat, he stressed that *any* linear object, including a foot, would have sufficed. These injuries thus could have resulted from a kick, such as the one witnessed by

Schlosser. This inconclusive physical evidence hardly provides "considerable assurance" of the statement's reliability. See *Chambers*, 410 U.S. at 300. The absence of clear physical evidence supports the state court's determination that the statement was not sufficiently reliable. Masini's purported motive to kill Keefer is also of limited significance. The contusions have nothing to do with Masini's supposed hiring of two men with bats.

The fact that Manon reported Masini's confession before the local paper published a story on Keefer's death is also at best weak corroboration. Keefer's body was found in the backyard of a "busy thoroughfare and … [his] home was surrounded by crime scene tape for all of a day before Manon talked to the police," according to the prosecution. Schlosser said that she and a friend returned to the crime scene some time after Johnson's beating and saw Keefer's body in the same spot. Word of Keefer's death (no matter the means) easily could have traveled fast around Rock Falls, whose population at the last Census did not exceed 10,000. Finally, Manon had a few hours between his release from jail and his report of Masini's statement to police—time during which he could have learned of Keefer's death in some way other than through Masini.

Johnson does not challenge the state court's conclusion that Masini and Manon were "mere cellmates," but he argues the state court overemphasized this fact in its reliability determination. The weight of that fact, however, was for the state court to determine. Johnson also argues that, even if Masini was a relative stranger, *Chambers* recognized that the spontaneity of a statement argues in favor of reliability. See 410 U.S.

at 300. True enough. But *Chambers* also holds that the close-ness of the relationship between declarant and witness is a key component of the reliability assessment of a statement against the declarant's penal interests. See *id*. at 300–01. In reality, Johnson wants us to analyze the hearsay anew by re-weighing these considerations to arrive at a different conclusion. That is not our role under AEPDA.

We do not find the Illinois Appellate Court's ultimate reliability determination to be an unreasonable application of *Chambers*, given the absence of corroborating evidence and obvious untrustworthiness of a murder confession to a stranger-turned-cellmate. Johnson's case is quite different from the one we faced in *Kubsch*, where we held that due process required the admission of a police interview of a witness because it was particularly reliable and essential to the defense. 838 F.3d at 845. The evidence at issue there was trustworthy, because it was recorded, independent, and almost contemporaneous, and also because there was some evidence that corroborated (and more that could have done so, if pursued) the out-of-court statement. *Id*. at 860–62. While the state court in Johnson's case might seen things differently, if for example it had placed more emphasis on the fact that Masini's confession was against his penal interest, its decision was well within the range of reasonable outcomes.

### III

Because we hold that the state court did not unreasonably apply *Chambers*, we do not need to address whether any error it might have made was harmless. We simply note that another reason to leave the state conviction undisturbed is the fact that any exclusion of the hearsay evidence probably made

no difference to the outcome, given the abundance of evidence against Johnson.

We therefore AFFIRM the judgment of the district court.