# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-70027

United States Court of Appeals
Fifth Circuit

**FILED**
July 29, 2019

Lyle W. Cayce
Clerk

MELISSA ELIZABETH LUCIO,

> Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

> Respondent - Appellee

Appeal from the United States District Court
for the Southern District Court
USDC No. 1:13-CV-125

Before HIGGINBOTHAM, HAYNES, and GRAVES, Circuit Judges.

PER CURIAM:*

Melissa Lucio was convicted of murdering her two-year-old daughter Mariah and sentenced to death. *See Lucio v. State*, 351 S.W.3d 878, 880 (Tex. Crim. App. 2011). Her daughter's body had been badly bruised, but the State's examiner concluded that she died from a final blow to the head. The State's case against Lucio was built primarily on a videotaped interrogation of Lucio,

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

filmed in the midnight hours just after Lucio's daughter was declared dead. After about five hours of interrogation, Lucio admitted to, in her words, spanking her daughter. The State used those statements to argue to the jury that she confessed to abusing Mariah and that, by inference, she must have killed her. Lucio tried to rebut the impact of the interrogation by putting on an expert witness to explain why she would admit to facts that were not true. But the state trial court would not allow the expert to testify because it concluded such testimony was "irrelevant," depriving Lucio of her most compelling challenge to the statements.

Lucio has now sought federal relief under 28 U.S.C. § 2254, arguing she was deprived of her constitutional right to meaningfully present a complete defense. She raised that issue first in the state court, but no state court ever adjudicated the claim. We thus review her claims under a de novo standard of review. Under that standard, we conclude that the state trial court deprived Lucio of her constitutional right to present a meaningful defense. We thus REVERSE the district court's order denying her claim and REMAND for the district court to grant Lucio relief.

## I.  Background

Before her daughter's death in 2007, Lucio lived with nine of her children and her husband. On a February evening that year, paramedics were called to Lucio's home. When they entered the apartment, they found two-year-old Mariah "unattended and lying on her back in the middle of the floor not breathing and with no pulse." Lucio told the paramedics that Mariah had "fallen down some stairs." The paramedics took Mariah to an emergency room, where doctors declared her dead.

Doctors at the hospital noticed that Mariah's body had been "severely abused"; in addition to bruises "covering her body, there were bite marks on her back, one of her arms had been broken probably about two to seven weeks

before her death, and she was missing portions of her hair where it had been pulled out by the roots."

That same night, several investigators questioned Lucio. The interview began just before 10:00 p.m. Lucio told the police that Mariah had fallen down some stairs outside of her apartment on Thursday night. Though she admitted that she sometimes spanked her daughters "on the butt," she repeatedly denied hitting or abusing Mariah. Over about three hours, her story remained the same: Her kids were rough with Mariah but she did not know who caused Mariah's specific injuries. She also described Mariah's physical condition leading up to her death. Mariah was "sick" on the Saturday that she died and the Friday before, but Lucio did not take Mariah to the doctor. Mariah would not eat, and her breathing was heavy. She slept all day Saturday, and she would lock her teeth together when Lucio would try to feed her. The interrogation went on for more than three hours.

Then, after 1:00 a.m., Texas Ranger Victor Escalon entered the room and told Lucio—in a long, mostly one-person exchange—that they needed her story and that everyone would understand. At that point, Lucio told Escalon she wanted a cigarette and to talk to her husband. Escalon told her she could do those things after she gave her statement. Escalon then asked Lucio repeatedly to tell him "everything."

Lucio eventually told him that she "would spank [Mariah], but [Lucio] didn't think [she] would spank her, to where . . . to where it got to this point." (ellipsis in transcript). At Escalon's suggestion, Lucio said that the spanking was "all over [Mariah's] body." Escalon prompted her for more, but she responded, "I don't know what you want me to say. I'm responsible for it." She maintained that she was not angry at Mariah but was "frustrated" by the other kids who were "very hyper," making it difficult to take care of them all. She also stated that she bit Mariah one day while tickling her; she did not know

why she did it. While making these statements, Lucio continued to maintain that she had not hit Mariah in the head and only spanked her. She also stated that no one else was responsible for Mariah's injuries and that she was the only one who spanked her.

As the interrogation progressed, Escalon identified specific bruising on Mariah and asked Lucio to tell him how it happened. Lucio usually responded that she did not know how the bruises occurred and often said she did not hit her in particular spots. When Escalon insisted she was responsible for specific bruises, Lucio responded, "I guess I did it. I guess I did it." She suggested that some of the other injuries, like scratches, could have been caused by her other daughters. For some of the bruises, Lucio said she was the one who caused them, and said she would sometimes spank Mariah when she woke up other kids.

Escalon then had Lucio take a break at 1:22 a.m. After the break, officers took DNA samples from Lucio, then took another break.

At 3:00 a.m., Escalon resumed the interrogation. He brought in a doll to have Lucio show him how she bit and spanked Mariah. When showing him how she bit Mariah, Escalon asked if she was angry at Mariah. She said no, explained she was frustrated with the other kids, and described how she bit Mariah after she finished brushing her hair. Escalon then asked Lucio to show how she spanked Mariah. When she demonstrated, Escalon told her, "Well do it real hard like . . . like you would do it." (ellipsis in transcript). When she said that was how hard she spanked her, Escalon performed what he thought was a hard spank and had Lucio demonstrate again. He identified several sets of bruises and had her spank the doll in those areas to demonstrate how she would have spanked Mariah.

Lucio was charged with "intentionally and knowingly" causing Mariah's death "by striking, shaking or throwing Maria[h] . . . with [her] hand, or foot,

or other object," which constituted a capital murder charge. *See* TEX. PENAL CODE §§ 19.02(b)(1), 19.03(a). The issue then was not simply whether Lucio inhumanely neglected Mariah—virtually a given on this record—but whether she intentionally or knowingly killed Mariah and did so by striking her. *See Louis v. State*, 393 S.W.3d 246, 251 (Tex. Crim. App. 2012) ("Capital murder is a result-of-conduct offense; the crime is defined in terms of one's objective to produce, or a substantial certainty of producing, a specified result, i.e. the death of the named decedent." (quoting *Roberts v. State*, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008))).

The State's theory of the case depended on two critical points. First, it sought to prove that Mariah's death was caused by a fatal blow to the head and that the fatal blow could not have been from Mariah falling down the stairs. The State presented testimony from the chief forensic pathologist for Cameron and Hidalgo Counties, who conducted Mariah's autopsy. She testified that Mariah's cause of death was "blunt force trauma." The pathologist defined this as being "beat[en] about the head with something—an object, a hand, a fist, or slammed." According to her, the trauma would have occurred within a day before Mariah's death. It would have been immediately apparent that Mariah needed medical attention, as symptoms like vomiting or lethargy would have appeared "fairly quickly" after the trauma. The pathologist also explained that a fall down the stairs would not have caused all of Mariah's injuries. Even considering just the bruises on her head, the pathologist concluded that a single fall down the stairs could not have caused all of them. She also testified that this was the most severe case of child abuse she had ever seen in her fourteen-year practice. Mariah had more bruises, of varying color and age, than she had ever seen on one child.

Second, the State used Lucio's "confession" to try to establish that she abused Mariah and, in turn, caused her death. The State admitted the videos

No. 16-70027

of Lucio's interrogation during the first day of trial and immediately played them for the jury.  It later put Escalon on the stand, and he testified about Lucio's demeanor during the interrogation.  During its closing argument, the State characterized Lucio's admission as a "confession," which proved beyond a "reasonable doubt that [Lucio] killed that little girl."  It emphasized that Lucio "did make the statement and the statement that she made was the true and correct statement at the end.  She admitted it.  She admitted that she caused all of the injuries to that child, ladies and gentlemen."  The State also highlighted Lucio's demeanor during the interrogation, rhetorically asking why she would look or act a certain way if all she did "was physically beat the child, but didn't cause the death."  It also referenced Escalon's testimony that Lucio's demeanor indicated she was "hiding the truth."

Lucio tried to defend against both points.  First, she tried to present evidence that it was possible that Mariah's head trauma was caused by a fall down the stairs.  She called a neurosurgeon who testified that the blunt force trauma causing Mariah's death could have resulted from falling down stairs.  During closing arguments, Lucio's counsel argued that the State failed to overcome reasonable doubt because evidence indicated that Mariah's fatal injury could have resulted from falling down stairs.

Second, Lucio wanted to present two expert witnesses to testify that her interrogation statements were not trustworthy, but the state trial court did not let them testify.   The first expert was Norma Villanueva, a licensed social worker with graduate-level education.  She was presented to explain "why [Lucio] would have given police [officers] information . . . that was not correct" to show that Lucio "admits to things that she didn't do."  Villanueva's training included courses on how to understand what people "are trying to convey by the way they act, by the way they hold their body, by the way they move their arms and hands."  Her claimed expertise was based on over twenty years of

6

"clinical training and clinical experience [and] a combination of knowing life span development theories . . . and human behavior social environment interaction theories." The state trial court would not permit Villanueva to testify over doubts that she was qualified to testify on body language interpretation and concerns that she could not testify about "why [a] statement is or is not true."

The second expert that Lucio wanted to present was Dr. John Pinkerman, a psychologist who would have testified that Lucio was a "battered woman" who "takes blame for everything that goes on in the family." He formed his opinion after reviewing the interrogation tapes, meeting with Lucio on four occasions, reviewing her history, and administering various psychological tests to her. The state trial court prevented Pinkerman from testifying; it considered his testimony irrelevant because Lucio "denied ever having anything to do with the killing of the child."

Beyond her medical expert and the two excluded experts, Lucio called one new witness and recalled one of the State's witnesses. The new witness was Lucio's sister, Sonia Chavez, who testified that Lucio "never disciplined her children." The recalled witness was Joanne Estrada, a child protective services worker. Estrada was asked about whether she had reviewed documents that showed that Mariah had tantrums while in foster care and had hit her head on the floor. Estrada testified that she had not come across anything in Lucio's file that showed she was "physically abusive to any of the children." Lucio presented no other witnesses.

Ultimately, Lucio was convicted and sentenced to death. Lucio appealed her conviction, but the Texas Court of Criminal Appeals affirmed. *Lucio*, 351 S.W.3d at 910. The State's argument on appeal continued to rely on Lucio's interrogation. In responding to Lucio's sufficiency of the evidence challenge, the State argued that a "jury could have reasonably concluded that [Lucio] was

responsible for delivering the fatal blow to Mariah's head, as she had the opportunity to do so, *and she had admitted to a pattern of abuse that had continued for some two months.*"  *Id.* at 894–95 (emphasis added).  The Texas Court of Criminal Appeals accepted that argument.  *Id.* at 895.

Lucio also appealed the district court's decision to bar her experts, Villanueva and Pinkerman, from testifying.  *Id.* at 897–902.  She argued that she should have been permitted to present Villanueva's and Pinkerman's testimonies to help prove her "confession" was involuntary.  Lucio contended that the jury could have "used it to decide whether the battered woman voluntarily gave the statement at the station to the police" and to show that she "would have and did tell the police whatever they wanted her to say."  *Id.* at 898.

The Texas Court of Criminal Appeals rejected Lucio's arguments for primarily procedural reasons.  It concluded that what she argued on appeal did "not comport" with the experts' "proffered testimony at trial."  *Id.* at 900, 902. She thus was found to have failed to preserve her arguments for appeal.  *Id.* The court alternatively noted that Villanueva's and Pinkerman's testimonies were only marginally relevant to the issue of whether Lucio's alleged confession was voluntary under state law.  *See id.* at 900–02.  Finally, it footnoted that excluding Villanueva's testimony would have been harmless "in light of appellant's subsequent admission during her recorded statement that she abused Mariah, followed by her demonstrating such abuse with the doll." *Id.* at 901 n.25.  It did not appear to make that same conclusion about Pinkerman's testimony.

After Lucio lost her appeal, she sought state habeas relief.  As with her direct appeal, she argued that Villanueva's and Pinkerman's testimony should have been admitted.  This time, though, she distinguished her argument as going "to the core of the case—whether [Lucio] was likely to have engaged in

ongoing abuse of Mariah." She stated that the issue was the deprivation of "the constitutional right to present a complete defense," and cited a state law case that relied on the Federal Constitution for that right. This issue is the only one on which a COA was granted and, using the terminology from that order, we refer to this as the "complete defense" claim.

The state habeas court rejected her argument. It concluded that her claim was "nearly identical to [the issues] raised on direct appeal," and she had not presented any additional evidence in support of the claim. Her claim thus failed. The state habeas court also concluded that the "district court did not abuse its discretion in excluding" the expert testimony. It concluded that Villanueva was not an expert in "interpreting body language and patterns of behavior during police interviews." It separately concluded that Pinkerman's testimony "had no relevance to the question of [Lucio's] guilt or innocence."

Lucio appealed the state habeas court's decision. The Texas Court of Criminal Appeals adopted the habeas court's findings of fact and conclusions of law. It noted that some of the issues Lucio raised were procedurally barred, but her "complete defense" claim was not among those found barred.

Lucio later filed an application for federal habeas relief pursuant to 28 U.S.C. § 2254 in federal district court, again asserting her "complete defense" claim. The district court rejected the claim. It concluded that she had not shown that the state trial court's "exclusion of Villanueva's testimony on the basis of Villanueva's lack of expert qualifications was incorrect" and there were no indications of "police misconduct, or any police action that rendered Lucio's statements involuntary." The district court considered Pinkerman's testimony to be "only tangentially related to the question of Lucio's guilt or innocence." It also noted that the "evidence that anyone but Lucio inflicted the fatal injuries is tenuous at best."

9

No. 16-70027

Lucio filed a timely notice of appeal and this court granted her a COA on "the question of whether the exclusion of Lucio's proffered experts on the credibility of her alleged confession violated her constitutional right to present a complete defense."

## II.    Discussion

Lucio asserts that she was deprived of her due process right to present a complete defense when the district court excluded the testimony of Villanueva and Pinkerman. To prevail, she must satisfy the statutory requirements of AEDPA. She and the State dispute whether AEDPA's typical standard of review—whether the state court's adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1)—applies here. Lucio asserts her claim should be reviewed de novo instead of under § 2254(d)'s stringent standard, because the claim was not "adjudicated on the merits," as that provision requires. The State argues the claim was adjudicated on the merits or, if it was not adjudicated, it is because Lucio failed to present the claim to the state court. Both parties assert they win on the merits of Lucio's claim regardless of the standard of review. We begin by addressing the procedural questions and then turn to the merits.

### A. Exhaustion and Standard of Review

The State argues that Lucio did not exhaust her claim or, alternatively, that her claim is subject to the strict standards of review under § 2254(d)(1). We reject those arguments. Lucio exhausted her "complete defense claim," and the state court did not adjudicate that claim.

We begin with exhaustion. A petitioner seeking federal relief under § 2254 must first exhaust her state remedies. *See* 28 U.S.C § 2254(b)(1)(A). The State argues that Lucio did not exhaust her claim because she argued a state law claim in state court, not a federal constitutional claim. To exhaust a

10

claim, a "prisoner must 'fairly present' [her] claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

Lucio fairly presented her claim in state court. A prisoner can exhaust a claim in state court by raising it through post-conviction proceedings, even if she did not raise it in her direct appeal. *See Orman v. Cain*, 228 F.3d 616, 620 & n.6 (5th Cir. 2000). Lucio's argument to the state habeas court flagged her "complete defense" argument as a "constitutional" issue and cited a Texas case that relied exclusively on the Federal Constitution. *See Wiley v. State*, 74 S.W.3d 399, 405–07 (Tex. Crim. App. 2002)); *Wiley v. State*, No. 03-99-00047-CR, 2000 WL 1124975, at *1 (Tex. App. Aug. 10, 2000) (discussing exclusively the Federal Constitution). Texas does not appear to have recognized (or rejected) a "complete defense" right under its own constitution, and Lucio did not mention state evidentiary rules or standards in her state filings. So her argument could not easily be mistaken for raising an exclusively state law claim. After the state habeas court rejected her claim, Lucio sought review from the Texas Court of Criminal Appeals, which also rejected her claim. She has thus exhausted the claim.

We need not decide whether Lucio's claim was procedurally defaulted in state court and thus provided an adequate and independent state ground to support the state court's judgment. Default on state law grounds is a separate doctrine related to the exhaustion requirement. *See Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017). The State has not argued, either below or on appeal, that Lucio defaulted her complete defense claim on state law grounds. We are not required to raise the issue sua sponte, though we retain discretion to do so. *See Trest v. Cain*, 522 U.S. 87, 89 (1997); *Magouirk v. Phillips*, 144 F.3d 348, 357–58 (5th Cir. 1998); *Smith v. Johnson*, 216 F.3d 521, 524 (5th Cir. 2000) (per

curiam); *Moreno v. Dretke*, 450 F.3d 158, 165 n.3 (5th Cir. 2006). We decline to do so. Before we could conclude that an adequate state law ground existed, we would have to determine that the state rule barring consideration was "firmly established and regularly followed." *Walker v. Martin*, 562 U.S. 307, 316 (2011) (internal quotation marks omitted). We have found no Texas case law regarding the appropriate time to raise a "complete defense" claim. Then, even if we concluded there was an adequate and independent state law ground, we would have to determine whether there was "cause" that would excuse Lucio's state default. *See Davila*, 137 S. Ct. at 2064–65. These hurdles are likely why the State forfeited any argument that Lucio defaulted her claim on state law grounds. We thus decline to raise the issue sua sponte.

The parties do dispute whether Lucio's "complete defense" claim was adjudicated on the merits. A claim is adjudicated on the merits if a state court issues an opinion rejecting the claim, and state courts are presumed to have rejected a claim on the merits if a written order is silent regarding a claim. *See Johnson v. Williams*, 568 U.S. 289, 300–01 (2013). That presumption may be rebutted by some "indication" or "state-law procedural principles to the contrary." *Id.* at 298 (quoting *Harrington v. Richter*, 562 U.S. 86, 99 (2011)). The Supreme Court provided rhetorical examples of indications that the presumption should not apply, including:

- If the state standard, "in at least some circumstances[,] . . . is *less* protective" than the federal standard, *Id.* at 301;
- If the state and federal standards are "quite different" and a party makes "no effort to develop" the alternative standard, *id.*; or
- If a party only passingly cites the relevant standard, *id.*

Thus, "while the . . . presumption is a strong one that may be rebutted only in unusual circumstances, it is not irrebuttable." *Id.* at 302.

12

No. 16-70027

The state court did not expressly adjudicate Lucio's claim. The State argues that the state habeas court adjudicated the claim in paragraphs thirty-nine and forty of its findings of fact and conclusions of law. Those paragraphs address state evidentiary standards and assert that Lucio's claim was redundant of her direct appeal argument. But Lucio explicitly framed her argument as a constitutional claim distinct from what she argued on direct appeal. The state habeas court's order thus did not adjudicate the claim that Lucio made.

Lucio has rebutted the presumption of adjudication. Lucio has identified aspects of her case that are like those that the Supreme Court suggested could rebut the presumption of adjudication. Instead of adjudicating her actual claim, the state habeas court adjudicated a similar state claim. It likely did so because the State responded to Lucio's argument as though it should be adjudicated on state evidentiary standards. But the standards for Lucio's constitutional claim and state evidentiary rules are "quite different" from each other. *Williams*, 568 U.S. at 301. Indeed, the whole point of Lucio's "complete defense" claim is that, even if state evidentiary laws were correctly followed, she was deprived of a constitutional right. The state habeas court thus adjudicated a separate issue without addressing the heart of Lucio's claim under the appropriate standards. This case thus fits one of the examples the Supreme Court recognized as rebutting the presumption of adjudication on the merits. *See id.* The state habeas court did not adjudicate Lucio's "complete defense" claim.

Consequently, Lucio's claim is subject to de novo review in federal district court and on appeal. *See id.* at 301–02; *Lewis v. Thaler*, 701 F.3d 783, 787 (5th Cir. 2012).

No. 16-70027

## B. "Complete Defense" Claim

Lucio argues she was deprived of the right to present a complete defense. She argues that by excluding Villanueva's and Pinkerman's testimony, the trial court made it impossible for her to meaningfully dispute the importance and meaning of the videotaped interview. We agree that excluding Pinkerman's testimony deprived her of the right to present a complete defense; because we do, we do not need to examine whether excluding Villanueva's testimony was also a violation of her constitutional rights.[1]

The Supreme Court has recognized that the Constitution guarantees criminal defendants a "meaningful opportunity to present a complete defense." *United States v. Scheffer*, 523 U.S. 303, 329 (1998) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). In a series of cases, it held that the applications of various state evidentiary rules infringed that right.[2] Though the Supreme Court's case law has "typically focus[ed] on categorical prohibitions of certain evidence," *Caldwell v. Davis*, 757 F. App'x 336, 339 (5th Cir. 2018) (per curiam), we have at least once held that a state court's application of a discretionary

---

[1] At the very least, the exclusion of Villanueva's testimony raises concerns about the fairness of the trial. The State asked Ranger Escalon to describe Lucio's demeanor during her interrogation; he responded that it indicated that she was saying, "I did it." The State then asked him to detail his experience interviewing people and to contrast Lucio's demeanor with others' demeanor. Escalon did not indicate he had any formal training on reading body language. By contrast, Villanueva did have such training and was not allowed to testify on that subject.

[2] *See Crane*, 476 U.S. at 684, 691 (holding that the state court's exclusion of evidence probative of the credibility of the defendant's confession because the proffered evidence was relevant to voluntariness, an issue the court had already ruled on, violated the defendant's right to a fair trial under the Sixth and Fourteenth Amendments); *Washington v. Texas*, 388 U.S. 14, 15, 23 (1967) (holding that a state statute barring the defendant from calling a "principal[], accomplice, or accessor[y] in the same crime" as a witness in his defense violated the defendant's rights to call witnesses in his own defense and to compulsory process for obtaining such witnesses); *Chambers v. Mississippi*, 410 U.S. 284, 297–98, 302–03 (1973) (holding that the Mississippi voucher and hearsay rules were unconstitutional as applied to the extent that they prevented the defendant from: (1) putting on evidence of a third party's confession to the crime with which the defendant was charged and (2) challenging that witness's subsequent retraction).

14

evidentiary rule violated a defendant's right to present a complete defense. *See Kittelson v. Dretke*, 426 F.3d 306, 321 (5th Cir. 2005) (per curiam).

But the right to present a complete defense is not unfettered. The Supreme Court has "found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308. "[T]he Constitution leaves to the judges who must make [evidentiary] decisions 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S. at 689–90 (ellipsis and third set of brackets in the original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *see also Patterson v. Cockrell*, No. 01-11170, 2002 WL 432402, at *2 (5th Cir. 2002) (unpublished) (per curiam) ("*Crane* cannot be interpreted to convert every arguable misapplication of state evidentiary rules into an unconstitutional denial of a fair trial.").

The trial court's decision to exclude Pinkerman's testimony "infringed upon a weighty interest of the accused" so as to be "unconstitutionally arbitrary." *Scheffer*, 523 U.S. at 308. Lucio's counsel made clear that Pinkerman would present expert evidence that, as a result of her psychological profile, Lucio "takes blame for everything that goes on in the family. . . . She takes blame for everything that goes on in the house," even for acts that she did not commit. The state trial court concluded that Lucio "admitted actions that she took that could have resulted in the death. But she denied ever having anything to do with the killing of the child." It thus had "a hard time figuring out how it goes to the guilt or innocence" and denied Lucio the opportunity to present Pinkerman's testimony.

The trial court's conclusion was inconsistent with the reality of this trial. Lucio's admissions of abuse within her interrogation statement were the most significant evidence in the case. *See, e.g., Arizona v. Fulminante*, 499 U.S. 279,

297 (1991) ("Absent the confessions, it is unlikely that [the defendant] would have been prosecuted at all, because the physical evidence from the scene and other circumstantial evidence would have been insufficient to convict."); *Bruton v. United States*, 391 U.S. 123, 139 (1968) ("[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him."). The State presented no physical evidence or witness testimony directly establishing that Lucio abused Mariah or any of her children, let alone killed Mariah. Instead, it presented Lucio's interrogation statement—admitted and played during the testimony of its first witness—as its crucial source of proving she committed the act. The State's theory was that Lucio's interrogation admissions were true, that she was responsible for a pattern of brutal abuse of Mariah, and that, from these admissions, the jury could infer beyond a reasonable doubt that Lucio also struck the fatal blow to the head that killed the child. In closing argument, the State summarized its case by contending that Lucio must have killed Mariah because she abused her. The only evidence it cited in closing to establish that Lucio abused her was Lucio's "confession." On appeal, when it argued the evidence was sufficient to convict Lucio, it again relied on the assertion that Lucio "admitted to a pattern of abuse." *See Lucio*, 351 S.W.3d at 894–95 (internal quotation mark omitted). Contrary to the state trial court's conclusion, the interrogation statement played a pivotal role in the State's case as to guilt or innocence.

If the interrogation statement is taken away—or its validity is undermined—then the State's case becomes much more tenuous. A reasonable juror would have much less reason to infer that Lucio—rather than her husband, other children, or Mariah herself[3]—caused Mariah's injuries, much

---

[3] Lucio's counsel introduced evidence about records that reported that Mariah would hit her head against the ground when throwing a tantrum.

less her fatal head injury. To the extent that there was evidence beyond Lucio's statement that implicated her—such as opportunity as Mariah's primary caretaker—it pales in comparison to the force of an apparent confession of abuse.

As critical as that evidence was to the State, explaining why it could not be trusted was as critical to Lucio's defense. To paraphrase the Supreme Court, why Lucio would confess to abusing her daughter if she did not actually abuse her was a "question every rational juror need[ed] answered" before acquitting. *Crane*, 476 U.S. at 689. Lucio attempted to explain the alleged confession with Pinkerman's testimony. Neither the State nor the state trial court questioned Pinkerman's expert credentials. Pinkerman's opinion was that Lucio was susceptible to taking blame for something that was not her fault and that this behavior was manifested in the interrogation video. It thus cast doubt on the State's key evidence and was paramount to Lucio's defense. The state trial court's exclusion of Pinkerman's testimony impinged on Lucio's "weighty interest" in explaining why her "confession" to abuse did not support an inference of guilt beyond a reasonable doubt. *Scheffer*, 523 U.S. at 308.

The exclusion bears the hallmark sign of arbitrariness: complete irrationality. The state trial court asserted that Pinkerman's testimony's casting doubt on the veracity of the interrogation statement was not relevant because Lucio did not admit she struck the fatal blow. But the State's argument that Lucio struck the fatal blow relied on an inference from the statements that she abused Mariah. To undercut the State's premise (i.e., Lucio abused Mariah) is to undercut its conclusion (i.e., Lucio killed Mariah). "In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" *Crane*, 476 U.S. at 690–91 (quoting *United States v. Cronic*, 466 U.S.

648, 656 (1984)).[4] We thus conclude that the state court's ruling was "of such a magnitude or so egregious that [it] render[ed] the trial fundamentally unfair." *Gonzalez v. Thaler*, 643 F.3d 425, 430 (5th Cir. 2011).

Our conclusion bears strong resemblance to our previous conclusion in *Kittelson v. Dretke*, where we concluded that a state trial court deprived a defendant of the right to present a complete defense. *See* 426 F.3d at 321. There, a state court prohibited a defendant accused of sexually assaulting a young girl from "mention[ing] or allud[ing] to" the fact that one of the girl's friends had also accused him of sexual assault, only to later recant. *Id.* at 309– 12, 321. But the State was permitted to present evidence that the friend was present and questioned about the abuse. *Id.* Like here, the state trial court in *Kittelson* was not "concerned about the prejudicial effect of the jury hearing" the excluded testimony. *Id.* at 321. Like here, the other evidence that the defendant was permitted to present did not go "directly" to the "critical" evidence that the State presented. *Id.* The same type of unfair, arbitrary consequences present in *Kittelson* are present in Lucio's case.

The State primarily contends that the state trial court's decision was not arbitrary based on a rationale that the state trial court never considered. It argues that Pinkerman's testimony would have been "tantamount to a direct

---

[4] But even assuming the state trial court were right that the only issue was whether she struck the fatal blow and that evidence undermining the interrogation statement was not relevant, its ruling would still be arbitrary. Based on those assumptions, the state trial court should not have admitted the interrogation in the first place. As the state trial court said, Lucio does not admit to striking the fatal blow, so it would not (on the assumptions it made) go to her guilt or innocence. Worse yet, admitting such an irrelevant video would be far more prejudicial to Lucio than admitting Pinkerman's testimony would be to the State. So even if the state trial court's theory were right, the decision to permit the State's irrelevant, prejudicial evidence but exclude Lucio's irrelevant, non-prejudicial evidence is arbitrary. Favoring the State over Lucio on such a critical issue also approaches irrationality. *See Kubsch v. Neal*, 838 F.3d 845, 858 (7th Cir. 2016) ("Arbitrariness might be shown by a lack of parity between the prosecution and defense; the state cannot regard evidence as reliable enough for the prosecution, but not for the defense.").

opinion on truthfulness" and was therefore inadmissible under other state evidentiary rules. That argument suffers two problems. First, it relies on state evidentiary rules that address bolstering a witness's trial testimony. *See Yount v. State*, 872 S.W.2d 706 (Tex. Crim. App. 1993); *Duckett v. State*, 797 S.W.2d 906 (Tex. Crim. App. 1990), *disapproved of by Cohn v. State*, 849 S.W.2d 817 (Tex. Crim. App. 1993). Setting aside the fact the State's brief ignores the nuance in those rules, the State's argument lacks any force because Lucio was not a witness at trial and because Pinkerman was not there to bolster her credibility. Second, the State does not explain why excluding Pinkerman's testimony under those state evidentiary rules would not have denied her the right to present a meaningful defense any more than excluding it under relevance rules would.[5]

The exclusion of Pinkerman's testimony prejudiced Lucio. "Complete defense" claims are subject to harmless error analysis. *See United States v. Skelton*, 514 F.3d 433, 438 (5th Cir. 2008). As discussed above, Lucio's interrogation statement was the most significant evidence in the case, on which the State repeatedly relied. None of the alternative evidence the State points to as making the exclusion harmless comes close to the impact of the interrogation statement.[6] So this is not a situation where the evidence is so

---

[5] In passing, the State argues that the state trial court's decision was proper because Pinkerman's bill of particulars—the procedural mechanism used to capture what an excluded witness would have testified about—did not specifically mention battered wife syndrome. But the bill of particulars tracks the same type of evidence that Lucio's counsel argued Pinkerman would present, even if they do not use the same terms. Moreover, the state trial court excluded Pinkerman's testimony before he offered his bill of particulars, so Pinkerman's subsequent summary is of little value in deciding whether the state trial court's actions were arbitrary.

[6] The State's best alternative evidence is a statement from a police officer that, after Lucio's arrest and while driving, Lucio used the phone to call a sister. According to the officer, Lucio told her sister, "Don't blame, Robert [i.e., her husband]. This was me. I did it. So don't blame Robert." Though this is evidence in the State's favor, it pales in comparison to the power of Lucio's videotaped "confession," which went unchecked. It was a hearsay statement

No. 16-70027

overwhelming that Lucio would have been convicted regardless. Without Pinkerman's testimony, Lucio's only evidence left to rebut the notion she abused her children was her sister's testimony. The arbitrary exclusion of Pinkerman's testimony prejudiced her.

Preventing Pinkerman from testifying infringed Lucio's right to meaningfully present a complete defense and it was not harmless error.

### III.    Conclusion

Consequently, we REVERSE the district court's order and REMAND for the district court to grant Lucio relief.

---

without the context of what was being said on the other end of the phone. Additionally, the credibility of the officer's testimony is subject to attack. He did not create a log of Lucio's alleged statements until nearly sixteen months after he interacted with Lucio—the month before trial.